JOHN L. GLEASON v. UNIVERSITY OF MINNESOTA and Others.[1]

May 29, 1908.

Nos. 15,685—(192).

**University of Minnesota.**

 The Board of Regents of the State University are by section 4, art. 8, of the constitution, and by section 1470, R. L. 1905, constituted a body corporate under the name of the University of Minnesota.

**Board of Regents.**

 Such board is by law exclusively vested with the management of all the educational affairs of the institution, and the courts of the state have no jurisdiction to control its discretion; but, if the board refuses to perform any of the duties imposed upon it by law, mandamus will lie to compel it to act.

**Registration of Student.**

 Upon the face of the petition a prima facie case is stated that the relator was entitled to registration as a student of the University.

Petition to the district court for Hennepin county, upon relation of John L. Gleason, for a writ of mandamus commanding the Board of Regents of the University of Minnesota to reinstate the relator as a student in the department of law. From an order, Frederick V. Brown, J., overruling a demurrer to the petition, defendants appealed. Affirmed.

*Edward T. Young*, Attorney General, *Chas. S. Jelley*, Assistant Attorney General, and *Geo. W. Peterson*, Assistant Attorney General, for appellants.

*Geo. B. Leonard* and *John P. Devaney*, for respondent.

LEWIS, J.

 Appeal by the state from an order of the district court overruling the state's demurrer to relator's petition for a writ of mandamus commanding the Board of Regents of the University of Minnesota to reinstate the relator as a student in the department of law, with all the privileges incident thereto.

[1] Reported in 116 N. W. 650.

· The petition sets forth in considerable detail the several territorial and congressional acts, and the constitution, bearing upon the origin and history of the university and states: That the relator is a resident of Hennepin county, and was born in the city of Minneapolis in 1883. That in the fall of 1902 he passed the examination and was admitted as a student to the university, enrolled in the department of science, literature, and the arts, and for three years continued to be a student in that department. That in the fall of 1905 he was duly enrolled as a student of the law department, and continued as such until the close of the school year in June, 1907. September 25, 1907, he presented himself to the registrar for the purpose of registering as a student in the department of law for the ensuing term, and requested a statement of the amount of fees necessary. That he was thereupon handed a copy of a resolution to the effect that he had been dropped as a student for deficiency in his work, charged with certain insubordinate acts towards the faculty. That he requested the registrar to be allowed to register in some department other than that of law, and was informed that his registration in any department of the university would not be considered. The petition alleges that the resolution was adopted by the executive committee of the Board of Regents, without any notice to relator and without giving him a hearing; that the action of the executive committee was due to prejudice and personal feeling against the relator; that the meeting was wholly ex parte, and that no evidence whatever was taken; that relator had not violated any rule or law of the university.

The first question raised by the demurrer is whether the regents are amenable to an action of this character. Chapter 28, Ter. St. 1851, contains the original act establishing the University of Minnesota. By section 7 the regents, and their successors in office, were constituted a body corporate under the name and style of the "Regents of the University of Minnesota," with the right as such of suing and being sued, of contracting and being contracted with, of making and using a common seal, and altering the same at pleasure. The same act provided that the university should be divided into certain departments, conferred certain powers on the regents, and provided that the proceeds of all lands that might be granted by the United States to the territory for the support of the university should be and remain a per-

petual fund, to be called the "University Fund," the interest of which should be appropriated to its support. Section 4, art. 8, of the constitution, reads: "The location of the University of Minnesota, as established by existing laws, is hereby confirmed, and said institution is hereby declared to be the 'University of the State of Minnesota.' All the rights, immunities, franchises and endowments heretofore granted or conferred are hereby perpetuated unto the said university; and all lands which may be granted hereafter by congress, or other donations for said university purposes, shall vest in the institution referred to in this section."

As early as 1862 this court had occasion to determine the powers of the Board of Regents, under the act of 1851, in the case of Regents of the University v. Hart, 7 Minn. 45 (61), and it was held that the Board of Regents constituted a public corporation, having power to contract indebtedness, and to be subject, within the limitations imposed by the act, to suits at law brought to enforce their obligations. We are not aware that the question has ever been directly raised since that decision. The legal status of the Minnesota State Agricultural Society, as defined in Berman v. Minnesota State Agricultural Society, 93 Minn. 125, 100 N. W. 732, is radically different from that of the university. The agricultural society is a creation of the legislature, and it was held that there was no intention to create an independent body corporate, but that the intention was to create a department, or agency, of the state, to assist in carrying out the governmental functions of the state, and hence that the agricultural society constituted a part of the state, and did not have an independent legal capacity to sue and be sued.

The original act of 1851 expressly provided that the Regents of the University, and their successors, should constitute a body corporate, with the right as such of suing and being sued. It conferred express power on the regents to procure a suitable site within the vicinity of the Falls of St. Anthony, and to erect suitable buildings and to expend such portion of the available funds as they deemed expedient for the erection of buildings, the purchase of apparatus, etc.; and it was also expressly provided that the selection, management and control of all lands which might thereafter be granted by congress for the endowment of the university were vested in the Board of Re-

gents. A location was selected, land grants acquired, and the university had become an established fact at the time of the adoption of the constitution. We think that it was the intention of the framers of the constitution, by the adoption of section 4, art. 8, to perpetuate the corporate character of that institution, and, within certain limits, to make it capable of suing and being sued. Our attention has been called to the fact that by section 1470, R. L. 1905, the revisers re-enacted sections 3904, 3905, G. S. 1894, to read as follows: "* * * Such board shall be a body corporate under the name of the 'University of Minnesota.' It shall have a common seal and alter the same at pleasure." It will be observed that the revisers dropped the words: "And by that name may sue and be sued, contract and be contracted with."

We have carefully considered the suggestions of counsel for the state that, in view of the subsequent intention of the legislature as voiced by several acts and R. L. 1905, limiting the control of the regents over the funds and placing the disbursement thereof in the hands of the state treasurer, should be taken into account in determining the effect of the constitutional provision. It is not necessary at this time to consider to what extent the Board of Regents has been deprived of the power to make contracts, or to what extent the board has been deprived of the control and disbursement of the university funds. Although some change has been made in the method of disbursing the funds available, no serious attempt has been made to legislate the corporate character of the institution out of existence. The status of the Board of Regents as a body corporate is fixed by the constitution, and if the change made in the revised laws was intended to relegate that body to the position of a mere agency of the state, it was unavailing. Without attempting to determine or consider the full extent of the powers enjoyed by the Board of Regents under the constitution and laws, we confine ourselves to the single question whether, in such a case as this, the decision of the board is final, or subject to review by the courts, and, if so, to what extent? We are of the opinion that the government of the university as to educational matters is exclusively vested in the Board of Regents, and that the courts of the state have no jurisdiction to control the discretion of the board; but if it refuses to perform any of the duties enjoined upon

it by law, or arbitrarily refuses any person entitled thereto the privileges of the university, mandamus will lie to compel the board to act. The Board of Regents is an inferior tribunal, corporation, or board, within the scope of section 4566, R. L. 1905.

In addition to the general powers conferred by the constitution and section 1470, R. L., already referred to, section 1473 provides that the Board of Regents shall enact by-laws for the educational government of the university, and shall elect suitable instructors, officers, and employees; shall fix their salaries, terms of office, and determine the moral and educational qualifications of applicants for admission; prescribe text-books and courses of study; and, in its discretion, confer such degrees and diplomas as are usual in universities. Under these general powers, the board has authority to prescribe the necessary rules and regulations for the management and government of the university, may require a classification of students with respect to the branches of study in different departments and with respect to proficiency necessary for advancement, and enforce prompt attendance, diligence in study, and proper deportment.

According to the petition, the reasons for refusing to continue the relator as a student are found in the resolution handed him when he applied for registration:

"Whereas, J. L. Gleason, a student in the College of Law during the past year, was dropped at the end of the year on account of deficiency in his work; and whereas, said Gleason is charged with certain insubordinate acts toward the faculty of the University of Minnesota and with inciting younger students to insubordinate acts towards said faculty—therefore, Resolved, that the registrar of the University of Minnesota is hereby instructed to refuse to register the said J. L. Gleason in any department of the University, and the said Gleason is hereby denied the right or privilege of serving on any board, council, or committee of the students' affairs of the University of Minnesota."

From this it appears that the relator was dropped at the end of the school year then just closed on account of deficiency in work, but it does not appear in what respect he was deficient. If he failed to pass the examinations and did not attain the degree of efficiency which entitled him to advance, then, under the general rule stated in the pe-

tition, he was entitled to take the work over again. As a student dropped behind in his work, he was permitted to register at the beginning of the next year, or term, and take the work over again. The petition admits that the relator was deficient in his work and not qualified to advance with his class; but it is also alleged that he had not knowingly violated any rule of the institution. We do not feel at liberty to construe the resolution in this instance to mean that registration was refused upon the ground that the relator had not, in good faith, applied himself to his studies. "Deficiency in his work" does not necessarily imply persistent inattention and failure to take advantage of his opportunities, and the fact that he was "charged" with insubordination does not warrant the inference that he was guilty, or that he had proved himself in all respects unworthy to be retained as a student. We are of opinion, therefore, that the petition states a prima facie case for registration, and that the regents should show cause, as directed by the court below.

Affirmed.