## SPRIK v REGENTS OF THE UNIVERSITY OF MICHIGAN

### OPINION OF THE COURT

1. COURTS—JURISDICTION—UNIVERSITY OF MICHIGAN—REGENTS.

   The Court of Claims has exclusive jurisdiction over claims against the Regents of the University of Michigan (MCLA 600.6419).

2. ATTORNEY GENERAL—COURT OF CLAIMS.

   The Attorney General is the exclusive representative of the state before the Court of Claims (MCLA 600.6416).

3. ATTORNEY GENERAL—ASSISTANTS—SPECIAL ASSISTANTS—COURT OF CLAIMS.

   The Attorney General may appoint a Special Assistant Attorney General to represent the state for the single purpose of defending a lawsuit brought in the Court of Claims and there is no requirement that such an assistant be paid by the Attorney General.

4. TAXATION—DEFINITION.

   A tax is an enforced contribution levied by the state for the support of government in discharge of its various functions and duties for all public needs.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 55 Am Jur, Universities and Colleges § 31 *et seq.*

[2] 7 Am Jur 2d, Attorney General § 9.

[3] 7 Am Jur 2d, Attorney General §§ 3, 5.

[4] 51 Am Jur, Taxation §§ 2, 3.

[5] 49 Am Jur 2d, Landlord and Tenant § 514.

[6] 49 Am Jur 2d, Landlord and Tenant § 528 *et seq.*

[7, 15] 17 Am Jur 2d, Contracts §§ 244, 245.

　49 Am Jur 2d, Landlord and Tenant § 141.

[8, 10] 15 Am Jur 2d, Colleges and Universities §§ 5, 29.

[9] No reference.

[11, 12] 51 Am Jur, Taxation § 619.

　15 Am Jur 2d, Colleges and Universities § 2.

[13] No reference.

[14] No reference.

[16–18] 40 Am Jur 2d, Landlord and Tenant § 525.

5. LANDLORD AND TENANT—RENT—DEFINITION.

    Rent is the return which the tenant makes to the landlord for use of the premises.

6. TAXATION—LANDLORD AND TENANT—RENTS—SCHOOL DISTRICTS.

    An increased payment collected by a tax-exempt state university in its status as a landlord of student housing which is subsequently voluntarily transmitted to a school district by the university as part of a payment to alleviate the burden on the school district caused by attendance of students' children at the public schools is an increase in rent rather than an illegal tax since the specific purpose for which the monies are being used does not change the nature of the payment made by the tenant, and the school district cannot enforce the payment.

7. LANDLORD AND TENANT—CONSTRUCTION OF LEASE—REASONABLENESS.

    The general rule that words used in a lease should be given a reasonable construction which will not give one party an unreasonable advantage over the other does not mean that the court must accept the lessee's theory of what the lease means.

8. COLLEGES AND UNIVERSITIES—CONSTITUTIONAL LAW—BOARD OF REGENTS—CONTROL OF FUNDS.

    The Board of Regents of the University of Michigan controls and directs all expenditures of university funds and may spend such funds for any object which is not subversive of its purpose or violative of public policy (Const 1963, art 8, § 5).

9. COLLEGES AND UNIVERSITIES—CONSTITUTIONAL LAW—LANDLORD AND TENANT—RENTS—SCHOOL DISTRICTS—PUBLIC POLICY.

    The voluntary payment of monies collected by a university in its status as a landlord of student housing to a local school district to alleviate the burden on the school district caused by attendance of students' children at the public schools promotes university-community relations and encourages local education and is therefore consistent with the constitutional provision favoring education (Const 1963, art 8, § 1).

10. COLLEGES AND UNIVERSITIES—LANDLORD AND TENANT—RENTS—SCHOOL DISTRICTS.

    A university's practice of paying a portion of rent collected in its capacity as a landlord of student housing to a local school district does not infringe on the Legislature's right to manage the school system since the donated funds are university revenues derived from rentals of university property.

11. COLLEGES AND UNIVERSITIES—TAXATION—EXEMPTIONS—WAIVER—
    RENTS—SCHOOL DISTRICTS.

    The voluntary payment of a portion of monies collected by a
    university in its status as a landlord of student housing to a
    local school district to alleviate the burden on the school
    district caused by attendance of the students' children at the
    public schools does not act as a selective waiver of the universi-
    ty's property tax exemption, thereby intruding on the Legisla-
    ture's power to tax by violating its exemption policies, since the
    university's lack of obligation to continue such donations and
    the school district's inability to enforce future payments pre-
    clude the existence of such a waiver.

12. COLLEGES AND UNIVERSITIES—CONSTITUTIONAL LAW—EXPENDI-
    TURES—APPROVAL.

    The University of Michigan, being a constitutionally established
    corporation rather than a legislative creature, has powers
    separate and distinct from those of the Legislature and does
    not need legislative approval of its expenditures (Const 1963,
    art 8, § 5).

13. COLLEGES AND UNIVERSITIES—CONSTITUTIONAL LAW—RENTS—
    SCHOOL DISTRICTS—STATE CREDIT.

    The voluntary payment of a portion of monies collected by a
    university in its status as a landlord of student housing to a
    local school district to alleviate the burden on the school
    district caused by attendance of students' children at the public
    schools does not fall within the constitutional prohibition
    against a grant of the state's credit for the benefit of another
    because no legally enforceable obligation has been created
    (Const 1963, art 9, § 18).

14. SCHOOLS AND SCHOOL DISTRICTS—CONSTITUTIONAL LAW—FREE PUB-
    LIC SCHOOLS.

    The donation by a university of a portion of monies collected for
    rent from student housing to a local school district to alleviate
    the burden on the school district caused by attendance of
    students' children at the public schools does not violate the
    constitutional guarantee of free public education for the stu-
    dents' children since the use of funds for a specific purpose does
    not change the nature of the payment made by the tenant
    (Const 1963, art 8, § 2).

DISSENT BY LEVIN, P. J.

15. COLLEGES AND UNIVERSITIES—LANDLORD AND TENANT—CONSTRUC-
    TION OF LEASE—RENT INCREASES.

    *Language in a lease between a university as landlord and mar-*

ried students as tenants in student housing reserving in the university the right to revise rental rates upward should be reasonably construed, and such a reasonable construction would not authorize a rent increase to defray the cost of an unprecedented and voluntary expenditure on the part of the university to subsidize a local school district.

16. COLLEGES AND UNIVERSITIES—LANDLORD AND TENANT—RENT INCREASES—ACCOUNTABILITY.

A university in its status as a landlord of student housing is accountable for the manner in which it exercises its reserved right to revise rents upward.

17. COLLEGES AND UNIVERSITIES—LANDLORD AND TENANT—RENT INCREASES—ACCOUNTABILITY—REASONABLENESS.

The standard to be applied in achieving accountability for a rent increase by a university in its status as a landlord of student housing when exercising its reserved right to revise rents upward is not whether the university acted reasonably, but whether the increase was within the reasonable contemplation of both parties.

18. COLLEGES AND UNIVERSITIES—LANDLORD AND TENANT—RENT INCREASES—SCHOOL DISTRICTS—REASONABLENESS.

Tenants of student housing at a university could not reasonably have been expected to contemplate the possibility of an upward revision of rent by the university in its status as a landlord to help defray the cost of sending the school-age children of some of them to local public schools, and therefore the increase was not authorized by a clause of the lease allowing an increase in the rent because it was not for a purpose within the reasonable contemplation of both parties.

Appeal from Court of Claims, Norman A. Baguley, J. Submitted Division 2 January 6, 1972, at Detroit. (Docket No. 11671.) Decided September 28, 1972. Leave to appeal granted, 388 Mich 811.

Complaint by Dale R. Sprik and others, as representatives of a class, against the Regents of the University of Michigan for a refund of rental sums collected by the Regents from student housing for transmittal to the Ann Arbor Public School Dis-

trict. Summary judgment for defendant. Plaintiffs appeal. Affirmed.

*Douvan, Harrington & Carpenter,* for plaintiffs.

*Roderick K. Daane,* for defendant.

Before: LEVIN, P. J., and HOLBROOK and BRONSON, JJ.

BRONSON, J. Defendant Regents maintain approximately 1,300 family units for housing married students on their North Campus. Some residents have children, some do not. In 1970, some 386 children from these units attended the Ann Arbor public schools. Plaintiffs are members of a class representing both the residents of this housing with children attending the Ann Arbor public schools and the residents who do not have children attending those schools. The lease agreements between the Regents and members of the plaintiffs' class read, in part, as follows:

"The University reserves the right to revise rental rates upward or downward during the term of this lease. In the event of a rent adjustment, the Lessee will be given a sixty-day notice of the increase prior to implementation."

On May 15, 1970, the defendant passed a resolution providing for a rent increase of $6 per month per unit "of married student housing".[1] This sum was to be part of a payment by the university to the Ann Arbor School District in lieu of taxes since university property is tax exempt. Some

[1] The Regents agreed to pay the Ann Arbor School District $252,000 subject to approval by the Attorney General or court decision. Thirty-five percent of this was to come from increased rents in married student housing. As of July 5, 1971, approximately $89,640 had been collected, assuming all sums assessed had been paid.

married student housing residents have children attending school in the Ann Arbor School District, others do not. Residents were informed of this increase by letter of May 25, 1970. The increase became effective August 1, 1970, and has been collected since.

Plaintiffs began this class action on March 5, 1971, in the Court of Claims. They requested a refund of the rental sum paid to defendant Regents for transmittal to the Ann Arbor Public Schools. Plaintiffs claimed that the defendant had no authority to collect this money or to make payments to the Ann Arbor School District.

Both parties moved for summary judgment agreeing there was no genuine issue of fact but disagreeing on the conclusion of law. The trial judge granted defendant's motion for summary judgment holding that defendant had authority to collect from the plaintiffs and to distribute the money to the Ann Arbor School District as a payment in lieu of taxes. Plaintiffs appeal this determination.

On appeal we are bound by the record as stipulated to by the parties which prevents this Court from adding to or supplementing the facts.

Plaintiffs' first contention is that defendant's general counsel could not represent the Regents in the Court of Claims as an unpaid Special Assistant Attorney General. When the hearing on this suit began, plaintiffs moved to strike the pleading submitted by defendant's general counsel, arguing that only the Attorney General or one of his assistants may represent the state's interest before the Court of Claims. MCLA 600.6416; MSA 27A.6416.

Defendant argues that its general counsel was appointed a Special Assistant Attorney General to

try this matter in the Court of Claims and that the trial judge correctly denied plaintiffs' motion.

The Court of Claims has exclusive jurisdiction over claims against the state. MCLA 600.6419; MSA 27A.6419. As the University of Michigan is a state institution, this includes claims against the Regents. *Fox v Board of Regents of the University of Michigan,* 375 Mich 238 (1965). The Attorney General is the exclusive representative of the state before the Court of Claims. MCLA 600.6416; MSA 27A.6416. Further, the Attorney General has the power to appoint assistants as he deems necessary. These assistants may appear before any court with powers and duties of the Attorney General subject to his orders and directions. Defendant's general counsel took the requisite oath and was appointed a Special Assistant Attorney General. There is nothing in the statute indicating that an assistant may not be appointed to perform only a single function. There is also no requirement that an assistant be paid by the Attorney General. 1 OAG, 1956, No 2561, p 583 (October 8, 1956). See, also, 1 OAG, 1955, No 2249, p 565 (October 25, 1955). Defendant's general counsel was legally qualified to practice before the Court of Claims.

Plaintiffs argue that defendant has no power to make payments to the Ann Arbor School District and that the rent increase is an illegal tax. Defendant, on the other hand, argues that it has merely raised the rent in compliance with the terms of the lease and that plaintiffs have not been granted a voice in the management of these premises. Central to this controversy is whether this increased monthly payment is a tax or a rent.

A tax is an enforced proportioned burden, charge, or contribution from persons and property, levied by the state, by virtue of its sovereignty, for

the support of government in discharge of its various functions and duties for all public needs. *Cooper, Wells & Co v St Joseph,* 232 Mich 255 (1925); *Employment Security Commission v Patt,* 4 Mich App 228 (1966). Rent is the return which the tenant makes to the landlord for use of the premises. *Munson v Menominee County,* 371 Mich 504 (1963); *Marsh v Butterworth,* 4 Mich 575 (1857). The two differ in that a tax is an enforced payment to a governmental unit for the public good which is uncertain as to amount and time of payment. 52 CJS, Landlord and Tenant, § 463, pp 347–348. The payment exacted here is being made to the university in its status as a landlord, is certain as to time and amount, and is being used to make a voluntary payment to a governmental unit. The governmental unit which will ultimately receive the money, the Ann Arbor School District, cannot enforce payment. The essence of this payment is that it is in return for the right to remain on the premises. The defendant is correct in its assertion that this exaction is merely an increase in rent. The fact that it is being used for a specific purpose does not change the nature of the payment. *Munson v Menominee County, supra.*

The lease in question allows the defendant to raise rent provided a 60-day notice is given prior to implementation. Defendant complied with this provision. Plaintiffs concede this but argue that rent may be raised only for legitimate purposes connected with housing occupied by the plaintiff class. They contend that this increase was not within the parties' contemplation and violates public policy. Lease provisions which violate public policy are void. *Skutt v Grand Rapids,* 275 Mich 258 (1936); *Feldman v Stein Building & Lumber Co,* 6 Mich App 180 (1967). Defendant argues that

the increase is valid under the lease's terms and that the lease does not grant plaintiffs a voice in managing university funds:

It is settled that courts attempt to effectuate the intent of the parties to a lease as it is set forth in the agreement. *Detroit Trust Co v Howenstein,* 273 Mich 309 (1935). It is clear from the lease's language and the surrounding circumstances that defendant may raise rents for any legal purpose.[2]

It is true that words used in a lease should be given a reasonable construction, if possible, which will not give one party an unreasonable advantage over the other. *Bortz v Norris,* 248 Mich 247 (1929). This is especially important, where, as here, the parties do not have equal bargaining power. The general rule does not mean that this Court must accept the lessee's theory of what the lease means. *McComb v McComb,* 9 Mich App 70 (1967). We do not agree with plaintiffs that the increase in question is for an illegal purpose.

The University of Michigan is a corporation established by the Constitution of this state. Const 1963, art 8, § 5. The Board of Regents has general supervisory control over the university and controls and directs all expenditures from university funds. Const 1963, art 8, § 5. It is well established that this section gives the Regents the entire control and management of university affairs, including the management of property and expenditure of funds, to the exclusion of all other departments of the state. *Weinberg v Regents of the University of Michigan,* 97 Mich 246 (1893). As the Legislature may not encroach on the Regents' power, once state funds are appropriated to the

---

[2] In addition to permitting the university to raise rents, the lease provides that "[t]he Lessee and the University agree to comply with all Federal, state, and local ordinances".

university, only the Regents may direct how they are spent. *Sterling v Regents of University of Michigan,* 110 Mich 369 (1896); *Board of Regents of the University of Michigan v Auditor General,* 167 Mich 444 (1911). The Legislature may put certain conditions on money it appropriates for the university which are binding if the Regents accept the money. These conditions may not interfere with the Regents' management of the university and may be applied only to state appropriated funds. *Regents v Auditor General, supra; State Board of Agriculture v Auditor General,* 180 Mich 349 (1914); *State Board of Agriculture v Auditor General,* 226 Mich 417 (1924). As the funds in question are not state appropriations, the defendant may spend the money for any object which is not subversive of its purpose. *Bauer v State Board of Agriculture,* 164 Mich 415 (1911). We may interfere with university control only if the proposed expenditure violates our Constitution or public policy.

Prior to 1969, the university operated a primary and secondary school which was attended by children of many Ann Arbor residents. This has been phased out and the land has been sold to the Ann Arbor School District. The Ann Arbor public schools are attended by children of residents in student married housing. No funds are received to compensate the district for the cost of educating these children. This lack of funding plus the phasing out of the university's school has placed a financial burden on the school district. When confronted with this problem, defendant chose to make a voluntary payment to the school district. Defendant chose to allocate part of this payment to that housing which imposes the burden on local schools, student married housing. As the mainte-

nance of this housing places a direct burden on the school district, we believe that a rational relationship exists between maintaining the housing and the purpose for which the increased rent is to be used.

A university does not exist in a vacuum. It is an integral part of the community in which it is located, in this case Ann Arbor. Actions taken by a university often have a direct and substantial impact on the community. Their actions often work to the serious disadvantage of the community and result in a lowering of the quality of life in the surrounding area. Many universities have been publicly criticized in recent years for failing to consider the consequences of their decisions on their neighbors and for refusing to alleviate the detrimental effects of these decisions when confronted by the community. Here, defendant has chosen to help alleviate the burden created as a result of its decision to maintain student married housing. This payment not only promotes university-community relations, it also encourages local public primary and secondary education. Not only is this consistent with the constitutional provision favoring education, Const 1963, art 8, § 1, it is also consistent with the concern a university should have for encouraging high-quality education at all levels.

Under article 8, section 1, the Legislature controls the state public school system. *Lansing School District v State Board of Education,* 367 Mich 591 (1962). As the donated funds in question are university revenues derived from rentals of university property, this payment does not infringe on the Legislature's right to manage the school system. If any limitation on the Regents' power to make this payment exists it must be found elsewhere in the Constitution.

Plaintiffs suggest three constitutional limitations on defendant's power to use increased rentals to make this payment. First, they contend that defendant's action is a selective waiving in favor of the Ann Arbor School District of the property tax exemption granted to the university. They further argue that since only the Legislature has the power to tax and to grant tax exemptions, only the Legislature may provide for payments in lieu of taxes. See MCLA 32.226; MSA 4.786(1); MCLA 120.20; MSA 5.2170; MCLA 125.1415a; MSA 16.114(15a). Defendant's action thus intrudes on the Legislature's power to tax by violating its exemption policies.

A waiver is the voluntary relinquishment of a known right. Black's Law Dictionary (4th ed), pp 1751–1752. University property is tax exempt. *Auditor General v Regents of the University of Michigan,* 83 Mich 467 (1890); *Detroit v George,* 214 Mich 664 (1921); *People ex rel Regents of the University of Michigan v Brooks,* 224 Mich 45 (1923); *Rockwell Spring & Axle Co v Romulus Twp,* 365 Mich 632 (1962). The exemption was granted by the Legislature, MCLA 211.7; MSA 7.7, and is protected by the Constitution. Const 1963, art 9, § 4. The consequences of waiving the exemption, assuming but not deciding the university may do so, would be for university property to be subject to taxation by all local taxing authorities. The power to tax this property would include the power to enforce the accruing liability. The waiver of an exemption subjects the waiving party to the duties and responsibilities the exemption allowed him to avoid.

We do not believe the defendant's action constitutes a waiver. The Regents have merely exercised their power over university funds to make a dona-

tion they believe will be beneficial to the university. The university has no legal obligation to make this payment and the Ann Arbor School District has no power to enforce it in the future. The Regents are free to alter their donation in the future or to decline to give it. The Regents have not agreed and their actions do not indicate that they have submitted university property to local taxation.

We also find no merit in plaintiffs' contentions that defendant needs legislative authority to make these payments and that its action intrudes on the Legislature's power to tax. Const 1963, art 9, § 1; *Lucking v People,* 320 Mich 495, 504 (1948). The university is a constitutionally established corporation. Const 1963, art 8, § 5. Its powers are separate and distinct from those of the Legislature. *Weinberg v Regents, supra.* Not being a legislative creature, it does not need legislative approval of its expenditures. *Weinberg v Regents, supra; Sterling v Regents, supra; Board of Regents of the University of Michigan v Auditor General,* 167 Mich 444 (1911). This being the case, in the absence of a waiver, there is no basis for finding that defendant has encroached on the Legislature's power to tax.

Plaintiffs' second contention is that defendant's action is a grant of the state's credit to the Ann Arbor School District. Article 9, § 18 of the 1963 Michigan Constitution provides:

"Sec. 18. The credit of the state shall not be granted to, nor in aid of any person, association or corporation, public or private, except as authorized in this constitution."

This prohibition is violated only when the state creates an obligation legally enforceable against it

for the benefit of another. See *Bullinger v Gremore,* 343 Mich 516 (1955); *Dearborn v Michigan Turnpike Authority,* 344 Mich 37 (1955); *Advisory Opinion re Constitutionality of PA 1966, No 346,* 380 Mich 554 (1968). As defendant's voluntary payment to the Ann Arbor School District did not constitute a waiver of the university's tax exemption, no legally enforceable obligation has been created.

Plaintiffs' final contention is that an exaction for the benefit of the Ann Arbor School District violates their children's right to a free education. Const 1963, art 8, § 2. In *Bond v Ann Arbor School District,* 383 Mich 693 (1970), the Supreme Court held that free means without cost or charge and that a school district could not exact a fee for those things essential to a system of free public education.

Plaintiffs would have us believe that the increased rent is a fee for the right of their children to attend public school. It is not. It is a charge for the right to live on the premises, a rent. The fact that it is used for a specific purpose does not change the nature of the payment. *Munson v Menominee County, supra.*

The trial judge did not err in granting a summary judgment in favor of defendant.

Affirmed.

HOLBROOK, J., concurred.

LEVIN, P. J. *(dissenting).* The lease entered into between the university and the married students contains the following provision:

"The University reserves the right to revise rental rates upward or downward during the term of this lease. In the event of a rent adjustment, the lessee will

be given a sixty-day notice of the increase prior to implementation."

It would be surprising to find in an ordinary lease a provision reserving to the landlord the right unilaterally to increase the rent unlimited by an explicit standard, such as the occurrence of an increase in taxes or in the cost of living, or the like.[1]

This is not, however, an ordinary lease. The landlord is not an ordinary landlord. The landlord is the University of Michigan. The tenants are married students enrolled at the university. What would be extraordinary in an ordinary lease is not at all surprising in this lease. Because of the special relationship between the landlord and its students, students signing the lease could justifiably repose special confidence in the landlord not to take advantage of the absence of an explicit standard.

That special confidence, sought and exacted by the university when it prepared a lease containing such an unusual prerogative, carries with it a duty to exercise the prerogative in a manner within the contemplation of the parties—*both* parties.

The meaning of this language reserving a right to increase rents should be determined in the light of all the circumstances. In my opinion this language does not authorize a rent increase to defray the cost of an extraordinary, unprecedented, and, insofar as the university was concerned, voluntary expenditure.

---

[1] "The fact that one of the parties reserves the power of fixing or varying the price or other performance is not fatal if the exercise of this power is subject to prescribed or implied limitations, as that the variation must be in proportion to some objectively determined base or must be reasonable." 1 Corbin on Contracts, § 98, pp 438–439. *Cf. Allen v Michigan Bell Telephone Co,* 18 Mich App 632 (1969).

A lease is a contract as well as a conveyance,[2] and ordinary rules of contract interpretation apply.[3]

Axiomatic among these is the rule that the task of the court is to ascertain the intention of the parties.[4]

In seeking the intention of the parties, reasonableness is the touchstone of interpretation:

"It is quite possible for two parties to make a valid contract that seems unfair or unreasonable or even absurd to other people. If, however, the words of agreement can be interpreted so that the contract will be fair and reasonable, the court will prefer that interpretation. Although at times the only reasonable interpretation may show that an unreasonable contract has been made, the unreasonableness of the result tends to make some other interpretation a reasonable one." 3 Corbin on Contracts, § 552, pp 210–211.

"Between two constructions, each probable or possible, one making a contract reasonable and fair, as applied to the subject-matter, and the other unjust and unreasonable, the former is to be preferred." *B Siegel Co v Wayne Circuit Judge,* 183 Mich 145, 153 (1914).

"While the intention of the parties, to be deduced from the language employed by them, must control, yet

---

[2] Compare 3 Thompson, Real Property, § 1110, p 377: "The law of landlord and tenant is sadly confused by the fact that the legal concept is a hermaphrodite, a combination of property and contract". See, also, Lesar, Landlord & Tenant, § 3.11, p 202.

[3] Contractual principles apply in the interpretation and construction of those aspects of the lease which are properly a matter of contract law. In various other aspects a lease must be construed according to the law of property. 3 Thompson on Real Property, § 1114, p 390. We are here concerned with the proper construction of a single covenant to which the peculiarities of property law are not applicable.

[4] 3 Corbin on Contracts, § 536, p 33; 4 Williston, Contracts (3d ed), § 601, p 303.

"But if no property rule intervenes, the general rule for interpretation of covenants in a lease is to expound them so as to give effect to the actual intention of the parties *as collected from the entire context."* 3 Thompson on Real Property, § 1114, p 390. (Emphasis supplied.)

the words used should be given a reasonable construction; if possible, one which will not give to one of the parties an unfair or unreasonable advantage over the other." *Blake v Metropolitan Chain Stores,* 247 Mich 73, 79 (1929).

See, also, *Detroit v A W Kutsche & Co,* 309 Mich 700, 709 (1944), and 1 Restatement, Contracts, § 236(a), p 327, to the effect that if fairly possible all clauses of a contract shall be given an "effective *and* reasonable meaning". (Emphasis supplied.)

The majority is quite correct in saying that we are not obliged to accept the lessee's theory of interpretation,[5] but, having recognized that a "lease should be given a reasonable construction, if possible, which will not give one party an unreasonable advantage over the other", we ought to go further and breathe life into those words.

In deciding whether *this* increase was in accordance with the intent of the parties we should ask —reading the words reserving the right in the light of all the circumstances—whether it is of a kind which ought to have been within the reasonable contemplation of the parties (both parties) at the time the lease was signed:

"It is elementary that a contract must be construed so as to effectuate the intent of the parties when it was made; and, to ascertain the intent of the parties, a contract should be construed in the light of the circumstances existing at the time it was made." *Kunzie v Nibbelink,* 199 Mich 308, 314 (1917).

In our perusal of the words reserving the right to increase rents, we should, because of the special relationship that exists between a university and its students, be especially assiduous in looking for

---

[5] Compare *McComb v McComb,* 9 Mich App 70, 75 (1967).

the true understanding on which the minds of both parties met, objectively determined by reading those words in the context of all the circumstances.

Professor Corbin, with typical perspicacity, wrote:

"The rules of substantive law applicable to a contract may, conceivably, be such that legal effect will be given to neither party's meaning and intention unless they are identical with those of the other party. It is often said that there must be a 'meeting of the minds.' If this is true, then the circumstances that surrounded and affected each of the parties are relevant, even though some of these circumstances may have affected one party and not the other. In the process of determining lack of identity in meaning, the meaning given by each party is a separate issue, to be determined in the light of the circumstances surrounding him.

"It is conceivable also that, having identified the person or persons whose meaning and intention are in issue, the best that a judge can do is to put himself so far as possible in the position of that person or persons, knowing their history and experience and their relations with other men and things, and then to determine what his own meaning and intention would have been. To do this requires a lively imagination, full and complete information obtained from the document and extrinsic testimony, and what we shall describe as sound judgment and common sense.

"If the foregoing suggests that it is not the meaning or intention of the party to the contract that is in fact given legal operation, but may be instead the meaning and intention that some imaginary reasonable, prudent, and intelligent man would have had (or, more realistically, the judge on the bench), we are not disposed to deny it. Nevertheless, it is the circumstances that surrounded and could have affected the party to the contract that are relevant to the issue, and not the circumstances that now surround the judge or the circumstances that might have surrounded some imaginary

reasonable and prudent ghost." 3 Corbin on Contracts, § 536, pp 33–36.

Although the provision of the lease reserving the right to revise rental rates does not require the university to explain why in a particular instance it chooses to exercise that right, it appears that in practice—the practical construction of the lease—the university regards itself to be under an obligation to attempt to justify an increase in rents. In this case the university attributed the increase to increased costs of operation and to an unmet need which it thought to be compelling, namely, the need of the school district for revenue to defray the cost of educating school-age children of married students residing in university-owned and, therefore, tax-exempt property. The resolution of the Regents authorizing the increase stated in part:

"Resolved, that rents for the University Family Housing for 1970–71 be increased by $11.00 per month, effective August 1, 1970, to cover a $5.00 increase in costs of operations anticipated in 1970–71 and one-third of the payment for school services."

The letter advising the student tenants of the increase stated in part:

"The new rents effective August 1, 1970 cover not only increases in cost of operations anticipated for next year but also include a sum of $6 per apartment per month as partial payment for school services available to children of University Family Housing residents."

The majority write that the university acted rationally in requiring married students to make a contribution to the cost of educating the children of some of them.

Why this concern with whether the university

acted rationally if it can peremptorily "revise rental rates upward"? It is because the university is and ought to be accountable for the manner in which it exercises the reserved right to revise rents upward.

I think we part essentially on the means and standards to be applied in achieving that accountability. In my opinion the issue is justiciable. And the issue is not whether the university acted reasonably—perhaps it did—but whether what it did was within the reasonable contemplation of both parties.

On this record I do not think that married student tenants who, before they signed the lease, read the words reserving the right to increase the rent should have been expected to understand that the university might call on them for an increase in rent to help defray the cost of sending the school-age children of some of them to the Ann Arbor public schools.

Payments of this kind had not theretofore been made by the university. It does not appear that it had been previously suggested, at least in any way which would have alerted the student tenants to this as a reasonable possibility, that the university should make such payments. I would conclude, in the absence of contrary evidence, that the tenants could not reasonably have been expected to contemplate the possibility of an upward revision for a purpose which was unprecedented and not otherwise foreshadowed.

When a tenant moves into an apartment he makes a commitment. It costs money to move in. It costs money to move out. It is time-consuming to move in and to move out, to establish relationships with suppliers, neighbors, and others. Tenants will, therefore, frequently suffer small rent in-

creases rather than go to the trouble of moving out. This provision giving this landlord the right to increase rents must be read with that in mind.

The clause requiring 60 days prior notice of a rent increase does not permit an increase in rent not otherwise authorized under the lease. Even though a student tenant theoretically could have moved out after receiving the 60-day notice, most of them, as a practical matter, had little or no choice but to suffer the $6-a-month increase. Since the lease should be construed to effectuate the meaning within the reasonable contemplation of both landlord and tenant, the landlord may not unilaterally contemplate new meaning by simply giving notice.

If, as I believe, the increase was not authorized by the lease because it was not for a purpose within the reasonable contemplation of both parties, the tenants had a contractual right to the enjoyment of their leasehold under the terms of the lease even though they received 60 days advance notice of the rent increase. The tenants have acted properly in banding together to enforce their contractual right to remain on the premises without payment of the unauthorized rent increase.

"That portion of the field of law that is classified and described as the law of contracts attempts the realization of reasonable expectations that have been induced by the making of a promise." 1 Corbin on Contracts, § 1, p 2.