REGENTS OF the UNIVERSITY OF
MINNESOTA, Respondent,

v.

James LORD, State Treasurer, State of
Minnesota, et al., Appellants.

No. 46999.

Supreme Court of Minnesota.

Aug. 12, 1977.

Rehearing Denied Sept. 22, 1977.

797

Warren Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., Kent G. Harbison, Sp. Asst. Atty. Gen., St. Paul, for appellants.

R. Joel Tierney, Dorsey, Windhorst, Hannaford, Whitney & Halladay and William J. Hempel, Thomas W. Finn and Mark A. Jarboe, Minneapolis, for respondent.

YETKA, Justice.

This action challenges the constitutionality of the state designer selection board act, Minn.St. 16.821 to 16.827, as applied to the University of Minnesota. The matter was heard in district court on cross motions for summary judgment and a stipulated set of facts. The trial court granted summary judgment in favor of the University of Minnesota on the grounds that, as applied to the university, the state designer selection board act invaded the management powers of the Board of Regents and thus violated Minn.Const. art. 13, § 3. We reverse.

On appeal this court is presented with the question whether the state designer selection board act constitutes an intrusion by the legislature into the management and control of the University of Minnesota as vested in the Board of Regents by the state constitution and thus violates Minn.Const. art. 13, § 3.

The state designer selection board act was enacted by the Minnesota legislature in 1974. The act establishes a selection board comprised of five voting members who are appointed by the governor. Each of the following three organizations *nominates* one individual for *appointment* by the governor: the consulting engineers council of Minnesota; the Minnesota society of architects; and the Minnesota board of the arts. In addition, two ex officio members participate in the interviewing and selection of designers, but do not vote. One of these is a representative of the commissioner of administration and the other member is a representative of the "user agency" which seeks the architect for a particular project. The act specifically includes the University of Minnesota, in addition to "any official, department or agency of the state government * * * over which the commissioner of administration has the power of supervision and control." Minn.St. 16.822, subd. 2. The board is empowered to carry out its responsibilities only for projects with estimated costs exceeding $250,000 or planning projects with estimated fees greater than $20,000. Minn.St. 16.825, subd. 1. Upon undertaking a project with costs or fees estimated in excess of such amounts, the user agency must submit to the commissioner of administration a request for a primary designer for the project. In addition to a description of the project and cost estimates, the request from the user agency must include a description of all special requirements or unique features. Minn.St. 16.825, subd. 2. The commissioner then must forward the request to the board. After publicizing the proposed project, establishing criteria for selecting a designer and interviewing candidates, the board selects the primary designer. No designer firm may be chosen in which a member of the board has a financial interest. Minn.St. 16.826, subds. 2 and 3.

Since the late 1920's the Board of Regents of the University of Minnesota, either directly or by delegation of authority, has

made all contracts for goods and services for the university. This has included contracts commissioning architects for the planning and construction of university buildings. During the last decade the faculty of the school of architecture and landscape architecture has consisted of individuals appointed to terms of up to 9 months with differing rates of compensation and time commitments to the university. These individuals have become associated with a variety of architectural firms in the metropolitan area and have in certain cases been associated with architectural firms commissioned by the Board of Regents to plan and construct university buildings.

By L.1974, c. 516, § 2, certain monies were appropriated to the Board of Regents of the University of Minnesota for the planning of certain construction projects, including $30,000 for planning phase I of the learning resources center on the St. Paul campus of the university, an amount which exceeded the threshold established by the state designer selection board act. The university selected a primary designer for this project according to its own selection procedure on February 18, 1975, rather than the procedure described in the state designer selection board act. The planning services for such project have been furnished to the university.

Through its administrative offices, the university requested payment for the planning services from the monies appropriated for the learning resources center. Acting under the direction of the state treasurer, the state commissioner of administration, and the state commissioner of finance, the state of Minnesota refused the university's request because it had not complied with the terms of the state designer selection board act.

By L.1976, c. 348, § 6, the legislature appropriated $4,897,489, to the Board of Regents to complete the learning resources center. The legislation conditioned the 1976 construction authorization to the university upon its compliance with "the terms and provisions of Minnesota Statutes, Sections 16.823 to 16.827."

The Board of Regents commenced an action against the State in district court requesting a declaration that the state designer selection board act, as it purports to apply to the university, is invalid on its face under the Minnesota constitution and seeking to permanently enjoin the withholding, under the act, of proceeds of appropriations for building construction projects. The parties submitted the dispute to the court on cross motions for summary judgment with stipulated facts. The district court granted summary judgment in favor of the university in all respects and held that the state designer selection board act violated the university's autonomy under Minn.Const. art. 13, § 3. In addition, the trial court ruled that L.1976, c. 348, § 6, subd. 10, also was invalid under the same constitutional provision. The state appeals from the judgment entered in favor of the university.

A. *The Constitutional Status of the University.*

■ The University of Minnesota is a "constitutional corporation," *State ex rel. University of Minnesota v. Chase,* 175 Minn. 259, 265, 220 N.W. 951, 954 (1928). This status grants the university much independence within the scope of its function. See, *State ex rel. Peterson v. Quinlivan,* 198 Minn. 65, 268 N.W. 858 (1936). This power given to the university is separate and complete and is, by necessity, denied to the legislature. This is not to say that the university is above the law. The Board of Regents is not "the [ruler] of an independent province or beyond the lawmaking power of the legislature." *State ex rel. University of Minnesota v. Chase,* 175 Minn. 266, 220 N.W. 954. The power of the university is limited by the terms of its charter, the provisions of the state and Federal constitutions, and Federal statutes. If it refuses to perform any of the duties imposed upon it by law, it may be subject to mandamus. See, *Gleason v. University of Minnesota,* 104 Minn. 359, 116 N.W. 650 (1908).

Historically, the grant of power to the university came in two steps. The original charter of the university was enacted in

1851. L.1851, c. 3. Its central purpose was to create a corporation. Among other things it declared that "the government of this University shall be vested·in a Board of

twelve Regents," L.1851, c. 3, § 4. The university functioned under the act of 1851 until a state constitution was adopted in 1857. What was then art. 8, § 3,[1] of the

1. In 1974 this became art. 13, § 3. The original charter (L.1851, c. 3) is set out herein in full:

"*Be it enacted by the Legislative Assembly of the Territory of Minnesota*, That there shall be established in this Territory an Institution, under the name and style of the University of Minnesota:

"Sec. 2. The proceeds of all land that may hereafter be granted by the United States to the Territory for the support of a University, shall be and remain a perpetual fund, to be called the "University Fund," the interest of which shall be appropriated to the support of a University, and no sectarian instruction shall be allowed in such University.

"Sec. 3. The object of the University shall be to provide the inhabitants of this Territory with the means of acquiring a thorough knowledge of the various branches of Literature, Science and the Arts.

"Sec. 4. The government of this University shall be vested in a Board of twelve Regents, who shall be elected by the Legislature as hereinafter provided.

"Sec. 5. The members of the Board of Regents shall be elected at the present session of the Legislature, and shall be divided into classes, numbered one, two, and three; class numbered one shall hold their offices for two years; class numbered two, for four years, and class numbered three, for six years, from the first Monday of February, one thousand, eight hundred and fifty one; biennially thereafter there shall be elected in Joint Convention of both branches of the Legislature, four members to supply the vacancies made by the provisions of this section, and who shall hold their offices for six years respectively.

"Sec. 6. Whenever there shall be a vacancy in the office of Regents of the University, from any cause whatever, it shall be the duty of the Governor to fill such office by appointment, and the person or persons so appointed, shall continue in office until the close of the session of the Legislature, then next thereafter, and until others are elected in their stead.

"Sec. 7. The Regents of the University and their successors in office, shall constitute a body corporate, with the name and style of the 'Regents of the University of Minnesota,' with the right as such, of suing and being sued, of contracting and being contracted with, of making and using a common seal, and altering the same at pleasure.

"Sec. 8. The Regents shall appoint a Secretary, a Treasurer, and a Librarian, who shall hold their respective offices during the pleasure of the Board. It shall be the duty of the Secretary to record all the proceedings of the Board and carefully to preserve all its books and papers; the Treasurer shall keep a true and faithful account of all moneys received and paid out by him, and shall give such bonds for the faithful performance of the duties of his office as the Regents may require.

"Sec. 9. The Regents shall have power, and it shall be their duty to enact laws for the government of the University; to elect a Chancellor, who shall be ex-officio, President of the Board of Regents, or when absent, or previous to the election of such Chancellor, the Board may appoint one of their own number President *pro. tem.* They may also appoint the requisite number of professors and tutors, and such other officers as they may deem expedient; also to determine the amount of their respective salaries: *Provided,* That the salaries thus determined, shall be submitted to the Legislature for their approval or dissent.

"Sec. 10. The University shall consist of five Departments: The Department of Science, Literature and the Arts: The Department of Law: The Department of Medicine: The Department of the theory and practice of Elementary Instruction: The Department of Agriculture. The immediate government of the several Departments shall be entrusted to their respective Faculties; but the Regents shall have power to regulate the course of Instruction, and prescribe under the advice of the Professorships, the books and authorities to be used in the several Departments, and also to confer such degrees and grant such diplomas as are usually conferred and· granted by other Universities.

"Sec. 11. The Regents shall have power to remove any officer connected with the Institution, when in their judgment the interest of the University requires it.

"Sec. 12. The admission fee to the University and the charges for tuition in the several Departments thereof, shall be regulated and prescribed by the Board of Regents; and as soon as in their opinion, the income of the University fund will permit, tuition in all of the Departments shall be without charge to all students in the same, who are residents of the Territory.

"Sec. 13. The University of Minnesota, shall be located at or near the Falls of Saint Anthony, and the Regents as soon as they may deem expedient, shall procure a suitable site for the ·erection of the University buildings, and they may proceed to the erection of the same as soon as funds may be provided for that purpose, after such plan or plans as may be approved by a majority of said Board.

"Sec. 14. The Regents shall have the power, and it shall be their duty, as soon as the requisite funds shall have been secured for that

state constitution "perpetuated" to the university "all the rights, immunities, franchises and endowments heretofore granted or conferred." By so doing, the Board of Regents of the University was invested with a power of management in the area of the governing of the duties of the university of which the legislature could not deprive them, subject to the right of the people to amend or repeal the constitution. The purpose of this—

> "* * * was to put the management of the greatest state educational institution beyond the dangers of vacillating policy, ill informed or careless meddling and partisan ambition that would be possible in the case of management by either legislature or executive, chosen at frequent intervals and for functions and because of qualities and activities vastly different from those which qualify for the management of an institution of higher education." 175 Minn. 274, 220 N.W. 957.

Thus, "[t]he whole power to govern the university * * * was put in the regents by the people. So no part of it can be put elsewhere but by the people themselves." 175 Minn. 274, 220 N.W. 957. What the Board of Regents may do, the legislature may not.

## B. Scope of the Powers Granted to the University; the Role of "Conditions."

■ The delineation of the power granted to the university is based in large part on the role of "conditions" placed upon appropriations. This authority derives from two cases. The first is the *Chase* decision, where this court stated (175 Minn. 268, 220 N.W. 955), quoting from a Michigan case:

> "*All* that power having been put in the regents, none of it remained to be exercised by any other body—not even the legislature itself. At the one extreme, the legislature has no power to make effective, in the form of law, a mere direction of academic policy or administration. *At the other extreme it has the undoubted right within reason to condition appropriations as it sees fit.* 'In such case the regents may accept or reject such appropriation, * * *. If they accept, the conditions are binding upon them.' *Board of Regents v. Auditor General,* 167 Mich. 444, 451, 132 N.W. 1037, 1041." (Italics supplied in part.)

The second is *Fanning v. University of Minnesota*, 183 Minn. 222, 227, 236 N.W. 217, 219 (1931), where this court stated:

> "* * * It is conceded that if the university accepts a donation or appropriation, it must take it with the conditions

purpose, to establish a Preparatory Department of said University, and employ teachers for the same, who shall be qualified to give instruction in all the branches of learning usually taught in Academies; which Preparatory Department may be discontinued whenever the Regents may think proper, after the other Departments of said University shall have been established.

"Sec. 15. The Regents are authorized to expend such portions of the fund, which by the provisions of this act, may come under their control, as they may deem expedient for the erection of suitable buildings, and the purchase of apparatus, a Library, and a Cabinet of Natural History; and the selection, management and control of all lands, which may hereafter be granted by Congress for the endowment of said University, is hereby vested in the Board of Regents.

"Sec. 16. The Regents shall make a report annually, to the Legislature at its regular session, exhibiting the state and progress of the University in its several Departments, the course of study, the number of professors and students, the amount of expenditures and such

other information as they may deem proper, or may from time to time be required of them.

"Sec. 17. Meetings of the Board may be called by any seven members thereof, at such time and place as they may deem expedient, and a majority of the said Board shall constitute a quorum for the transaction of business, but a smaller number may adjourn from time to time.

"Sec. 18. The Regents, if they shall deem it expedient, may receive into connection with the University, any college within the Territory, upon application of the Board of Trustees; and such college so received, shall become a branch of the University, and be subject to the visitation of the Regents.

"Sec. 19. No religious tenets or opinions shall be required to entitle any person to be admitted as a student in said University; and no such tenets or opinions shall be required as a qualification for any professor, tutor or officer of said University.

"Sec. 20. The Legislative Assembly may at any time, alter, amend, modify or repeal this act."

attached. *State ex rel. Black v. Board of Education*, 33 Idaho 415, 196 P. 201; *Board of Regents v. Auditor General*, 167 Mich. 444, 132 N.W. 1037. It may take it with the conditions, or it may leave it alone."

Thus, the first inquiry must concern the general type of conditions allowed by the constitution. Not all conditions, of course, would qualify as "within reason." This issue has been addressed by several other courts. The Michigan Supreme Court noted in *State Bd. of Agriculture v. State Admin. Bd.*, 226 Mich. 417, 425, 197 N.W. 160, 161 (1924):

> "Clearly, in saying that the Legislature can attach to an appropriation any condition which it may deem expedient and wise, the court had in mind only such a condition as the Legislature had power to make. It did not mean that a condition could be imposed that would be an invasion of the constitutional rights and powers of the governing board of the college. It did not mean to say that in order to avail itself of the money appropriated the [university] must turn over to the Legislature management and control of the college, or of any of its activities."

See, also, *Sprik v. Regents of the University of Michigan*, 43 Mich.App. 178, 204 N.W.2d 62 (1972), where the court held that conditions imposed by the legislature on appropriations may not interfere with the Regents' management, affirmed on other grounds, 390 Mich. 84, 210 N.W.2d 332 (1973); *State ex rel. Black v. State Bd. of Education*, 33 Idaho 415, 196 P. 201 (1921); *Caldwell v. Board of Regents*, 54 Ariz. 404, 96 P.2d 401 (1939); *King v. Board of Regents of the University of Nevada*, 65 Nev.

533, 200 P.2d 221 (1948). Regulations must not be of a character which would interfere essentially with the discretion granted the Board of Regents by the constitution. The issue for this court to decide is whether conditioning the appropriation of funds upon compliance with the state designer selection board act constitutes an attempt by the legislature to control the exercise of the constitutional powers of the Board of Regents over internal management of the university.

In other states, constitutional corporations have been held subject to the workers' compensation acts,[2] collective bargaining statutes,[3] and the abolition of governmental immunity to tort actions.[4] The University of Minnesota itself is already subjected to the Minnesota public employment labor relations act of 1971,[5] the highway traffic regulation act,[6] regulation of the sale of intoxicants,[7] and the regulation of its forest programs by the Department of Natural Resources.[8] While these regulations are not at issue here, their existence and the acquiescence by the university in their application does carry some significance towards a practical construction of the statutes in controversy in the instant case.

On the other hand, legislation has been held *invalid* which required a university to establish a medical college in one city and discontinue the existing college in another,[9] prohibited expenditure of state funds for instructors or students who had been convicted of the offense of interfering with normal university operations, or for any student, found by school officials or the courts, to have willfully damaged university

---

**2.** See, *Peters v. Michigan State College*, 320 Mich. 243, 30 N.W.2d 854 (1948) (affirmance by an equally divided court). See, generally, Waldoch, *Constitutional Control of the Montana University System: A Proposed Revision*, 33 Mont.L.Rev. 76; Note, 55 Mich.L.Rev. 728.

**3.** See, *Regents of the University of Michigan v. Michigan Employment Relations Comm.*, 389 Mich. 96, 204 N.W.2d 218 (1973).

**4.** See, *Branum v. State*, 5 Mich.App. 134, 145 N.W.2d 860 (1966).

**5.** Minn.St. 179.63, subd. 4.

**6.** Minn.St. 169.02 and 169.965.

**7.** Minn.St. 340.14, subd. 3(3) and (6); and 340.-58.

**8.** Minn.St. 89.41.

**9.** *Sterling v. Regents of the University of Michigan*, 110 Mich. 369, 68 N.W. 253 (1896).

property,[10] created an advisory board of regents,[11] or attempted to apply a nepotism act[12] or civil service act.[13] Also, one court has intimated that legislation aimed at a university alone or against an activity peculiar to the university would be invalid.[14] In addition, this court has struck down legislation which purported to authorize the commissioners of administration and finance to supervise and control "the expenditure of any and all moneys" by or for the university and "the making of all contracts" by the Board of Regents, on the grounds that "[t]he right so to control university finances is the power to dictate academic policy and direct every institutional activity";[15] refused to enjoin the construction of a dormitory on the university campus on the grounds that whether the university shall build is a question of university policy;[16] and struck down a statute which purported to allow the governor to appoint other regents and also to appoint three state officers ex officio regents.[17]

The state designer selection board act manifests a primary intent to avoid the conflicts of interest which arise when members of a state agency select a firm in which they have an interest, be it financial or otherwise. To this end, it requires that the board be composed of a representative nominated by the consulting engineers council of Minnesota; a representative nominated by the Minnesota society of architects; and a representative nominated by the Minnesota board of the arts. These provisions, among others, are provided to insure competency in the selection process. Moreover, the act requires that criteria adopted by the board for the selection process be made public, and that the board compile data on and conduct interviews with proposed de-

signers. The "user agency" (in this case the University of Minnesota) may participate throughout, although without having a vote in the final selection. Thus, the thrust of the statute is to promote the general welfare and to prevent conflicts of interests and fraudulent acts. It is not aimed specifically at the university but applies to all public agencies of the state.

The limited conditions imposed by the state designer selection board act are radically different from the direct attempt to control all university expenditures dealt with in the *Chase* case. Moreover, times have greatly changed since 1928 when the *Chase* case was decided. At that time the University of Minnesota was largely self-supporting insofar as operating revenues were concerned, and its building requirements from the legislature were relatively modest. Today, on the other hand, the University of Minnesota receives hundreds of millions of dollars in legislative appropriations each biennium for operations and building needs. In light of this fact alone, the legislature must by necessity be said to have the right to impose reasonable, even though limited, conditions on the use of such sizable appropriations of public funds.

■ We cannot and will not attempt to define in this case what conditions would be acceptable in other instances and which conditions would not. This must be decided on a case-by-case basis. In this case, we hold that the legislature has applied very minimal conditions on the use of funds appropriated by it to the university—conditions which are limited in scope and which are not an intrusion into the internal control and management of the university by its Board of Regents.

10. *Regents of the University of Michigan v. State*, 47 Mich.App. 23, 208 N.W.2d 871 (1973).

11. *King v. Board of Regents of the University of Nevada*, 65 Nev. 533, 200 P.2d 221 (1948).

12. *Dreps v. Board of Regents of the University of Idaho*, 65 Idaho 88, 139 P.2d 467 (1943).

13. *Hernandez v. Frohmiller*, 68 Ariz. 242, 204 P.2d 854 (1949).

14. *Peters v. Michigan State College*, 320 Mich. 243, 30 N.W.2d 854 (1948) (by implication).

15. *State ex rel. University of Minnesota v. Chase*, 175 Minn. 259, 261, 220 N.W. 951, 952 (1928).

16. *Fanning v. University of Minnesota*, 183 Minn. 222, 236 N.W. 217 (1931).

17. *State ex rel. Peterson v. Quinlivan*, 198 Minn. 65, 268 N.W. 858 (1936).

If the university were providing all funds for the construction of a building from its own revenues, it would not be subject to the terms of the act. Moreover, although the university does not select the designer, it certainly has the right to direct his actions and to reject any design it finds unsuitable. Also, while the state designer selection board act provides that the department of administration shall negotiate the designer's fee and prepare the contract to be entered into between the designer and the university, we hold that the Board of Regents of the university must be consulted during the negotiation process, and must specifically approve the contract both as to form and content before execution on the part of the Board of Regents.

Reversed and remanded with instructions to enter summary judgment for appellants in the form presented to the district court.

J. JEROME PLUNKETT, Justice * (dissenting).

I cannot agree with the majority holding that Minn.St. 16.821 to 16.827, setting up the state designer selection board, is a valid intrusion as it relates to the Board of Regents of the University of Minnesota.

This court in *State ex rel. University of Minnesota v. Chase*, 175 Minn. 259, 220 N.W. 951 (1928), laid down the fundamental proposition that the Board of Regents of the University of Minnesota had complete autonomy in the management of the university. It is true that since the *Chase* case the Board of Regents has allowed certain actions of the legislature to govern the University of Minnesota, such as application of the workers' compensation act, the labor relations act, and several others. However, such acquiescence by the Board of Regents must be construed as a matter of comity with the legislature and not a waiver of its fundamental rights as set forth by Minn. Const. art. 13, § 3.

The state designer selection board act takes away the Board of Regents' right to select designers and architects for university buildings. It is true that consultation would be made with the Board of Regents, but the state designer selection board has the final authority and the voting power. It is significant that pursuant to Minn.St. 16.826, subd. 6, the commissioner of administration may appoint a designer of a project without the recommendation of the state designer selection board if certain conditions have failed to take place.

I am not unmindful of the problem that the legislature has had in recent years in appropriating increasingly large sums of money for the operation of the university and its building program. The appropriation for the university in any given biennium is one of the largest sums provided for by the legislature. The legislature does, however, have certain valid constitutional controls over the Board of Regents by virtue of its right, without consent of the governor, to elect the Board of Regents and also the right to appropriate funds for the university.

The majority opinion places great emphasis for validity of the intrusion on the grounds that the intent of the act is to avoid conflict of interest of designers and architects dealing with the state. However laudable this aim, constitutional limitations are not to be ignored because the proposed violation is for a commendable purpose.

A second justification for the majority opinion is the fact that millions of dollars of state appropriated money are involved. This is a very novel and unique justification for allowing unconstitutional actions. An act is to be construed as to constitutional validity without regard to whether one penny of money is involved or millions of dollars.

The last justification of the majority opinion is the grounds that the intrusion here is very minor. The trial judge very succinctly answered this in his memorandum where he stated:

* Acting as Justice of the Supreme Court by appointment pursuant to Minn.Const. art. 6, § 2, and Minn.St. 2.724, subd. 2.

"It is argued by the Attorney General on behalf of the Defendants that the mere selection of an architect would not constitute an infringement upon the duties and responsibilities of the Regents in regards to University buildings. Few things, however, touch more upon the essence of our environment and community than the shape and style of the buildings in which we work and live. The selection of an architect and designer is perhaps the most important step in that building process, and is indisputably a managerial function, which must be exercised by the Regents."

If the intrusion into the rights of the Board of Regents is allowed in this case, what lies next—a "teacher selection board" —a "student selection board"? Where do we draw the line? The *Chase* case has already drawn the line and if we are to step over the line, the *Chase* case must be overruled.

For the above reasons I cannot agree with the majority opinion and hereby state that the trial court should be affirmed.

SHERAN, Chief Justice (dissenting).

I would affirm the trial court.

OTIS, Justice (dissenting).

I join in the dissent of Mr. Justice Plunkett.

KELLY, Justice (dissenting).

I join in the dissent of Mr. Justice Plunkett.