**STAR TRIBUNE COMPANY,**
**Respondent,**

**The Minnesota Daily, et**
**al., Respondents,**

**Northwest Publications,**
**Inc., Respondent,**

v.

**UNIVERSITY OF MINNESOTA**
**BOARD OF REGENTS, et**
**al., Appellants.**

**Nos. A03–124, A03–155.**

Supreme Court of Minnesota.

July 15, 2004.

John P. Borger, Eric E. Jorstad, Patricia R. Stembridge, Faegre & Benson LLP, Minneapolis, MN, for Star Tribune Company: Respondent.

Mark R. Anfinson, Minneapolis, MN, for the Minnesota Daily: Respondent/The Rochester Post–Bulletin: Respondent/Minnesota Joint Media Committee: Respondent.

Paul R. Hannah, St Paul, MN, for Northwest Publications, Inc.: Respondent.

Mark B. Rotenberg, Lorie S. Gildea, Clifford M. Greene, John M. Baker, Green Espel, PLLP, Minneapolis, MN, for University of Minnesota Board of Regents: Appellant/Reed, Maureen K.: Appellant/Bergland, Robert: Appellant/Baraga, Anthony R.: Appellant/Bell, Peter: Appellant/Berman, Frank: Appellant/Bohnsack, Dallas: Appellant/Hogan, William: Appellant/Keffeler, Jean: Appellant/McNamara, Richard: Appellant/Metzen, David: Appellant/Neel, Bryan H.: Appellant/Ransom, Lakeesha: Appellant.

Kent. G. Harbison, Fredrikson & Byron, PA, Minneapolis, MN, for Doe, John: Intervenor.

## OPINION

RUSSELL A. ANDERSON, Justice.

In this case we must determine whether the Minnesota Government Data Practices Act, Minn.Stat. §§ 13.01–.90 (2002), and the Minnesota Open Meeting Law, Minn. Stat. §§ 13D.01–.07 (2002), apply to the Board of Regents of the University of Minnesota (Regents) in its process of selecting a new University President, and if so, whether such application violates the autonomy granted to the Regents by the Minnesota Constitution. The district court ruled that the Regents' presidential search process was subject to those laws. The court of appeals agreed. We affirm.

In 2002, Mark Yudof announced that he would resign as president of the University of Minnesota effective July 31, 2002. The Regents established a Presidential Search Advisory Committee (PSAC) to "recruit, screen and recommend candidates" to succeed Yudof. From those candidates recommended by the PSAC, the Regents would select finalists who would be publicly interviewed and considered by the Regents, as required by the Open Meeting Law and the Board of Regents Bylaws.

In early November 2002, the PSAC completed its work and recommended candidates for the Regents' consideration. At a public meeting on November 4, 2002, the Regents modified the search process by adopting a resolution which indicated that some of the candidates recommended by the PSAC would not be willing to participate in public interviews until they had an opportunity to meet privately with the Regents. According to their resolution, the

Regents would not be able to make an informed decision or fulfill their duty to select the most qualified candidate or candidates for president without confidential interviews and confidential deliberations. The Regents' resolution modified the search process to allow confidential interviews with selected candidates and confidential deliberations before meeting publicly to discuss and select the finalist or finalists to be considered for president. The Regents' resolution provided for a public interview process with the finalist or finalists before selection, but suspended the section of the Regents' By–Laws which would have required the Regents to adhere to the Open Meeting Law during the presidential search process.[1]

Following modification of the search process, the Regents privately interviewed the candidates recommended by the PSAC. On November 6, 2002, the Regents announced that a finalist or finalists for the position of president would be named the following morning, and the next morning, the Regents announced that Robert Bruininks, the University's interim president, was the only finalist. The Regents elected Bruininks as president on November 8, 2002.

On November 8, 2002, various members of the print media (collectively referred to herein as "print media") commenced an action in Hennepin County District Court. The print media alleged that the modified search process violated the Open Meeting Law and the Data Practices Act, and sought an order to compel the Regents to disclose the names and public data of the candidates interviewed by the Regents. The print media's complaint also sought to

---

1. The resolution stated:

 **BE IT FURTHER RESOLVED** that the first sentence of Board of Regents Bylaw, Art. VI, § B ("The Board of Regents adopts as its policy the Minnesota Open Meeting Law as set forth in Minnesota statute"), is hereby suspended insofar as it is applicable to the presidential search process set forth herein.

enjoin the Regents from further violations of the Open Meeting Law.

The parties brought cross-motions in district court, the Regents seeking to dismiss the complaint on grounds that they were not required to comply with either the Open Meeting Law or the Data Practices Act in their presidential search process, and the print media seeking partial summary judgment requiring disclosure of the names and public data of the candidates interviewed. The district court granted the print media's motion for partial summary judgment, ruling that the Regents were required to comply with the Open Meeting Law and Data Practices Act. The district court ordered the disclosure of the names and public data of the candidates interviewed by the Regents.

The court of appeals granted the Regents' petition for discretionary review and a stay of the district court's disclosure order, and in the opinion that followed, the court of appeals held that the Open Meeting Law and Data Practices Act applied to the Regents' presidential search process and affirmed the district court's order granting partial summary judgment requiring disclosure of the names and public data of the candidates interviewed by the Regents. We granted review and stayed the district court's disclosure order pending our decision. We now affirm and lift the stay.

## I.

■ Our first task is to determine whether the courts below correctly decided that the Data Practices Act and the Open Meeting Law apply to the Regents as a matter of statutory interpretation. Statutory interpretation is a legal issue which we review de novo. *Vlahos v. R & I Constr. of Bloomington, Inc.,* 676 N.W.2d 672, 679 (Minn.2004).

### A. Data Practices Act.

■ The Data Practices Act mandates which state and local government records must be accessible to the public. *See* Minn.Stat. §§ 13.01–.90 (2002). The act provides that the names of applicants for employment by a state agency are classified as "private data *except when * * * considered * * * to be finalists* for a position in public employment." Minn.Stat. § 13.43, subd. 3 (emphasis added). "Finalist" is defined as "an individual who is selected to be interviewed by the appointing authority prior to selection." *Id.* Thus, the candidates interviewed by the Regents were finalists under the terms of the Data Practices Act, and their names and certain other information are public if the act is applicable to the Regents.

■ The act is applicable to "[a]ll state agencies, political subdivisions and statewide systems." Minn.Stat. § 13.01, subd. 1. "State agency" is defined as "the state, the *University of Minnesota,* and any office, officer, department, division, bureau, board, commission, authority, district or agency of the state." Minn.Stat. 13.02, subd. 17 (emphasis added). As the University of Minnesota is expressly included in the act's definition of "state agency," the University of Minnesota falls within the scope of the Data Practices Act.

■ The Regents nevertheless argue that without more specificity, the Data Practices Act should not be applicable to its presidential search data. They contend that the act is not applicable to the search data because the legislature did not specifically reference university presidential search data and because only the University, and not the Regents, is named in the definition of state agency. We find these arguments to be unpersuasive. The structure of the Data Practices Act generally makes data possessed by identified entities

public data, unless the act provides otherwise. Minn.Stat. § 13.03, subd. 1 ("All government data * * * shall be public unless classified by statute, or temporary classification * * * or federal law, as nonpublic or protected nonpublic, or with respect to data on individuals, as private or confidential."). Thus, specific categories of data are expressly addressed in the act in order to create exceptions to the general rule of public availability. In fact, Minn. Stat. § 13.43 accomplishes this with respect to personnel data. That section includes provisions governing data on applicants for government employment and makes data on "finalists" for employment, that is, applicants who have been selected for interviews, public. Minn.Stat. § 13.43, subd. 3. Given the legislature's approach in drafting the Data Practices Act, its silence with regard to the University's presidential selection process more likely indicates intent to subject that process to the requirements of the act than to exclude it.

█ Furthermore, although the Regents are correct in pointing out that in some statutes the legislature refers to the University and in others it refers specifically to the Regents, examination of the context of those statutes does not support the Regents' conclusion that reference to the "University" in the Data Practices Act definition of state agency means that the Regents are not covered. If anything, the reference to the University instead of the Regents in the Data Practices Act was likely intended to convey a more *inclusive* meaning that would encompass all the units of the University that might possess data, including the Regents.

### B. Open Meeting Law.

█ The Open Meeting Law generally requires that meetings of state and local governments must be open to the public. Minn.Stat. § 13D.01. Unlike the Data Practices Act, the Open Meeting Law does not expressly mention the University or the Regents. As relevant here, it provides that all meetings, including executive sessions, of the governing body of a "public body" must be open to the public. Minn. Stat. § 13D.01, subd. 1(b)(6). The statute does not define "public body."

█ The Board of Regents is the governing body of the University of Minnesota. Univ. Charter § 4. The question, then, is whether the University is a "public body" within the terms of the Open Meeting Law. In statutory construction, words are to be given their common meaning. Minn.Stat. § 645.08(1) (2002). In common understanding, "public body" is possibly the broadest expression for the category of governmental entities that perform functions for the public benefit. Additionally, in addressing this issue we must remember that because the Open Meeting Law was enacted for the public benefit, we construe it in favor of public access. *State by Archabal v. County of Hennepin*, 505 N.W.2d 294, 297 (Minn.1993).

Although we have not used the precise term "public body" to describe the University, we have used terms that convey the same meaning. In *Knapp v. State*, we stated that the University "is a *state institution* established, controlled and carried on by the state itself." 125 Minn. 194, 197, 145 N.W. 967, 968 (1914) (emphasis added). In *University of Minnesota v. Chase*, we again described the University as "a *state institution* in the legal as well as the colloquial sense" and as "in the ordinary and functional sense, plainly an *agency of the state*." 175 Minn. 259, 262, 220 N.W. 951, 952, 953 (1928) (emphasis added).

In fact, the Regents do not contend that the University is not a public body. Rather, they argue that the Open Meeting Law does not apply to the Regents because the legislature did not expressly name the Re-

gents as an entity subject to the requirements of the law. The Regents rely on language from *Winberg v. University of Minnesota,* 499 N.W.2d 799 (Minn.1993), for this requirement of express inclusion. In *Winberg,* while assessing whether the University was a "political subdivision" subject to the Veterans' Preference Act, Minn.Stat. §§ 197.455 and .46 (2002), we explained:

> [I]n the great majority of laws it passes affecting the University, [the legislature] expressly includes or excludes the University or its board of regents as subject to or not subject to the law. Thus, if the legislature had intended the Veterans' Preference Act to apply to the University of Minnesota, it *most likely* would have included the University by specific reference. Using Minn.Stat. § 645.27, a rule of statutory construction which provides that "the state is not bound by the passage of a law unless named therein," the University, which is itself a constitutional arm of the state, would not be bound by the Veterans Preference Act unless explicitly named.

*Winberg,* 499 N.W.2d at 801–02 (emphasis added; footnote omitted).

For several reasons, we decline to construe this language from *Winberg* as creating a generally-applicable rule that the University is not subject to a law unless expressly included. First, the language itself is equivocal, stating only that the legislature "most likely" would have included the University by specific reference. *Id.* Second, had we intended the quoted language to create a bright-line rule, no further analysis would have been required. Instead, we proceeded to set forth several additional reasons why the Veterans' Preference Act would not be construed to apply to the University. *Id.* at 802. Third, in responding to the argument that other statutes that do not expressly name the University nevertheless apply to the school, we did not suggest that those statutes should not apply because of an express inclusion requirement, but instead explained that their application to the University could be based on the broader terms used by the legislature in those laws to define their applicability. *Id.* Significantly, one of the laws discussed was the Open Meeting Law, and we emphasized that the phrase "other public body" used therein is broader than the "political subdivision" language at issue in *Winberg. Id.*

Because the "public body" language of the Open Meeting Law is certainly broad enough to encompass the University, the Regents are in essence arguing there should be an exception to the stated scope of the Open Meeting Law for the University. However, as the court of appeals pointed out, the Open Meeting Law contains express exceptions for meetings of the commissioner of corrections, state agencies exercising quasi-judicial functions involving disciplinary proceedings and "as otherwise expressly provided by statute." Minn.Stat. § 13D.01, subd. 2. The University is not included among those express exceptions. Faced with a similar situation in *Chase,* we explained: "Certainly, while these exceptions were being created and stated, the University would also have been expressly excepted, if such had been the intention." 175 Minn. at 262, 220 N.W. at 953.

Given the broadly inclusive language of the Open Meeting Law, our numerous opinions recognizing the University as a public institution, the failure of the legislature to include the University among other expressly-stated exceptions, and our principle of construing the Open Meeting Law to favor public access, we hold that the University is subject to the terms of the Open Meeting Law.

The Regents further contend that *Southern Minnesota Municipal Power Agency v. Boyne,* 578 N.W.2d 362 (Minn. 1998), provides support for exempting the Regents from the requirements of both the Data Practices Act and Open Meeting Law. In *Boyne,* the issue was the applicability of those laws to the Southern Minnesota Municipal Power Agency (SMMPA). The SMMPA is a municipal corporation and a political subdivision of the state, but the enabling legislation for the SMMPA provides that the agency may exercise all powers "which might be exercised by a natural person or a private corporation in connection with similar property and affairs." *Boyne,* 578 N.W.2d at 363–364 (citing Minn.Stat. § 453.54, subd. 21 (2002)). In *Boyne,* we relied on this "private corporation" language to exempt the SMMPA from the requirements of the Data Practices Act and Open Meeting Law, reasoning that a private corporation is not required to comply with those laws. *Boyne,* 578 N.W.2d at 366.

The Regents argue that as the private corporation language exempted the SMMPA, the University's special constitutional autonomy should insulate it from the requirements of the Data Practices Act and Open Meeting Law. But our reasoning from *Boyne* is not applicable here. In *Boyne,* our rationale was that the legislature empowered the agency to act as a specific type of entity, a private corpora-

tion, which is not subject to the Data Practices Act and the Open Meeting Law. In contrast, although the University has been imbued with special constitutional status, we have consistently held that it remains a public entity, *see supra,* and have expressly stated that it "is in no sense a private corporation." *Knapp,* 125 Minn. at 197, 145 N.W. at 968.[2]

For these reasons, we conclude that both the Data Practices Act and the Open Meeting Law are applicable to the University and its search for a new president.

## II.

Because we have determined that the Data Practices Act and Open Meeting Law are applicable to the Regents' search for a new University President, we must next address the Regents' claim that such application infringes on the constitutional protections afforded to the Regents in its management of the University. The Regents argue that the University's "unique constitutional status" places it outside the reach of the Data Practices Act and Open Meeting Law. They contend that because the Minnesota Constitution "perpetuates" the powers conferred in the University Charter, including the Regents' express authority to select a president, any legislation that attempts to control the Regents' policy judgments in the presidential selection process is constitutionally impermissible.[3]

**2.** Both the Regents and the print media rely on failed legislation in support of their respective positions. The Regents argue that the failure of the legislature to enact a 1959 bill that would have imposed a requirement of public meetings on the Regents after receiving a letter opinion from the Attorney General stating that the requirement would infringe on the Regents' constitutional autonomy, buttresses its argument that the Open Meeting Law is not intended to apply to the Regents. In similar fashion, the print media contend that the failure of the legislature to pass a bill

introduced in 1985 that would have exempted the Regents from the personnel data requirements of the Data Practices Act demonstrates legislative intent that the act should apply to the Regents. We are loath to take the leap of attributing specific legislative intent to the legislature's failure to enact particular bills because of the myriad reasons and circumstances that can result in such inaction.

**3.** The Regents argue that, alternatively, we should construe the challenged laws as inapplicable to the presidential search process to

■ Issues of constitutional interpretation are questions of law which we review *de novo*. *State v. Brooks*, 604 N.W.2d 345, 348 (Minn.2000). The University and its Board of Regents indisputably enjoy special constitutional status; the University is not just a typical state agency. As we have recounted on several occasions, the University was originally chartered by an act of the territorial legislature in 1851. *See, e.g., Winberg*, 499 N.W.2d at 801. The act created a board of regents for the purpose of governing the University. *Id.*[4] When Minnesota achieved statehood in 1857, the constitution confirmed the establishment of the University and provided that "[a]ll the rights, immunities, franchises and endowments heretofore granted or conferred are hereby perpetuated unto the said University." *Knapp*, 125 Minn. at 198, 145 N.W. at 968 (citing Minn. Const. of 1857, art. VIII, § 4). Thus, the University Charter of territorial origins was given constitutional status within the state government.

■ The Regents assert that imposition of the requirements of the Data Practices Act and Open Meeting Law on the presidential search process impermissibly infringes on the powers of governance conferred on the Regents in the University Charter and "perpetuated" to the University in the constitution, particularly the authority to elect a chancellor (now referred to as University President). The Regents contend that we recognized their autonomy from control by the legislature in *Chase*, and that the principles enunciated therein must be applied here. *Chase*,

the Regents maintain, requires the conclusion that the legislature cannot impose the requirements of the Data Practices Act and the Open Meeting Law on the presidential search process where the Regents have found in their resolution that to do so "substantially interferes with the Regents' exclusive constitutional responsibility to govern the University and is seriously detrimental to the University's best interests."

In *Chase*, we considered whether a law that required all departments and agencies to seek approval from the state commission of administration and finance before spending funds or entering contracts applied to the University. *Chase*, 175 Minn. at 261, 220 N.W. at 952. We first held that the legislature intended the statute to apply to the University, because the University was an agency of the state and was not among the express exceptions created by the legislature. *Id.* at 262–64, 220 N.W. at 952–53. We explained that the power to manage the University was constitutionally vested in the Regents and that the legislature did not have the right to impose restrictions on the way in which the Regents managed the University. *Id.* at 266, 220 N.W. at 954. We held that application of the statute to the Regents was unconstitutional because it interfered with the Regents' exclusive authority to manage the University. *Id.* at 266, 220 N.W. at 954.

The University contends that as applied to the 2002 Regents' search for a University President, the Data Practices Act and Open Meeting Law violate the constitu-

---

avoid the necessity of confronting the alleged constitutional infirmities. Because we conclude there is no constitutional infirmity, there is no basis for altering our statutory interpretation analysis on this basis.

4. Section 4 of the University Charter provides: "The government of this University

shall be vested in a Board of twelve Regents, who shall be elected by the Legislature as hereinafter provided." Section 9 provides, in relevant part: "The Regents shall have power, and it shall be their duty to enact laws for the government of the University; to elect a Chancellor * * *."

tional autonomy doctrine developed in *Chase* and, therefore, no disclosure should be required. The University focuses on the language in *Chase* that declares that "the Legislature cannot transfer any of [the University's] constitutionally confirmed power from the regents to any other board, commission or officer whatsoever." *Id.* at 268, 220 N.W. at 955. In *Chase*, we declined to define the exact boundary "between the province of the general lawmaking power of the Legislature and that of the special managerial function of the regents." *Id.* at 268, 220 N.W. at 955. Similarly, the University urges us to avoid defining the constitutional boundary between the legislature and the Regents. The University asks us to declare that the Data Practices Act and the Open Meeting Law cannot be applied in this case because the search for a University President is a core function of the Regents.

We cannot agree that *Chase* mandates insulation of the University from the requirements of the Data Practices Act and Open Meetings Law in these circumstances. The scope of intrusion on the Regents' management powers is strikingly different here. In *Chase*, the statute at issue required centralized, executive branch approval of all expenditures and financial commitments of the University. We explained that "[t]he right so to control University finances is the power to dictate academic policy and direct every institutional activity." *Id.* at 261, 220 N.W. at 952. In contrast, the reach of the Data Practices Act and the Open Meeting Law is much narrower and more limited. Neither statute controls any aspect of substantive decision-making of the University or gives another agency authority regarding academic or management decisions. Rather, the statutes merely determine the extent of public access to meetings and information of this public institution.

Even in upholding the constitutional autonomy of the University against the intrusion attempted in *Chase*, we employed terms less expansive than the Regents would have us adopt here. For example, we explained that through the constitution the people invested the Regents with "a power of *management* of which no Legislature may deprive them. That is not saying that they are the rulers of an independent province or beyond the lawmaking power of the Legislature." *Id.* at 266, 220 N.W. at 954 (emphasis added). We emphasized a distinction between legislative and executive authority: "Generally, the distinction between the jurisdiction of the Legislature and that of the regents is that between legislative and executive power." *Id.* at 267, 220 N.W. at 954. We acknowledged (but did not delineate) a boundary "between the province of the *general lawmaking power* of the Legislature and that of the *special managerial function* of the regents in respect to the University." *Id.* at 268, 220 N.W. at 955 (emphasis added).

It is apparent that despite the recognition of constitutional autonomy regarding university management issues in *Chase*, the effect of the constitutional perpetuation of the University Charter was not to create an entity coordinate to the state government, or even coordinate to the legislature. Rather, the intent was to protect the internal management of the University from legislative interference. As we explained in *Chase*, the purpose of empowering the Regents with the management of the University was to

> put the management of the greatest state educational institution beyond the dangers of vacillating policy, illinformed [sic] or careless meddling and partisan ambition that would be possible in the case of management by either Legislature or executive, chosen at frequent

intervals and for functions and because of qualities and activities vastly different from those which qualify for the management of an institution of higher education.

*Id.* at 274–75, 220 N.W. at 957. This purpose was to put academic and university management issues in the hands of the Regents. The Data Practices Act and Open Meeting Law do not tread on those types of issues. These statutes address broader concerns of the relationship—and information flow—between public institutions and the people whom they serve.

In *University of Minnesota v. Lord,* we again considered the extent to which the University's constitutional autonomy protects it against control by the legislature. 257 N.W.2d 796 (Minn.1977). The issue there was whether the University was subject to the State Designer Selection Board Act that empowered a state board to select a designer for all state construction projects exceeding $250,000. The legislature had conditioned an appropriation to the University of funds for a learning resources center on compliance with the act. The Regents commenced an action against the state, requesting a declaration that the Designer Selection Board Act, as it purported to apply to the University, was invalid on its face under the Minnesota Constitution.

We again acknowledged the University's unique constitutional status and the exclusive authority of the Regents on matters of University management, but nonetheless upheld application of the Designer Selection Board Act. In upholding the condition imposed on the appropriation in that case, we noted that the thrust of the challenged law was "to promote the general welfare" and that it was not aimed at the University specifically, but applied to all agencies of the state. *Id.* at 802. Most important, we concluded that the statute was not "an intrusion into the internal control and management of the University." *Id.* In this regard we explained that "[t]he limited conditions imposed by the state designer selection board act are radically different from the direct attempt to control all university expenditures dealt with in the *Chase* case." *Id.*

The circumstances here present even less of an imposition on the Regents' prerogatives than those in *Lord.* In that case, the State Designer Selection Board would select the designer for a university project through a process in which the Regents could have input, but no vote. *Id.* In contrast, application of the Data Practices Act and Open Meeting Law to the presidential search process does not dictate who must be selected, criteria for consideration, or the nature of the vote needed for selection. The only impact is the degree of public access to the process.

The Regents attempt to limit the reach of *Lord* by contending that the principles articulated in *Lord* apply only if the legislative regulation is imposed as a condition attached to an appropriation, and suggest that perhaps no legislative enactment can apply to the University unless it is attached to an appropriation. We disagree with both of these propositions.

Discussing the scope of the legislature's authority in light of the University's constitutional autonomy, we explained in *Chase:* "At the one extreme, the Legislature has no power to make effective, in the form of law, a mere direction of academic policy or administration. At the other extreme it has the undoubted right within reason to condition appropriations as it sees fit." 175 Minn. at 268, 220 N.W. at 955. This illustration did not mean that the legislature has no power vis á vis the University except as a condition to an appropriation. Rather it set forth the two "extremes"—the most obviously impermis-

sible legislation, a law interfering with academic policy, and the most obviously permissible legislation, a condition, within reason, attached to an appropriation. That there is room for permissible legislation in between those two examples is inherent in our description of them as the extremes.

In *Lord*, we noted that "[i]f the university were providing all funds for the construction of a building from its own revenues, it would not be subject to the terms of the act." 257 N.W.2d at 803. This proviso made sense in the context of a statute that by its terms did not apply unless a threshold dollar amount ($250,-000) was reached. Significantly, we merely said that if the University were providing all the funds, it *would* not be subject to the act, not that it *could* not be subject to the act.

 Further, we have previously noted other, generally-applicable laws that are not conditions attached to appropriations that apply to the University. For example, in *Winberg v. University of Minnesota*, we discussed at least three such laws which were applicable to the University: the Public Employees Labor Relations Act, Minn.Stat. ch. 179A (2002); the Minnesota Human Rights Act, Minn.Stat. ch. 363 (2002); and the Open Meeting Law. 499 N.W.2d 799, 802 (Minn.1993).

Application of the Data Practices Act and Open Meeting Law to the presidential search satisfies the standards we articulated in *Lord*. Both statutes are intended to promote the general welfare by making government information accessible to the people. Both statutes are applicable not just to the University, but to all state agencies, as well as local government entities. Finally, neither statute is an intrusion into the internal management of the University. They affect the presidential search process only in its interface with the outside world, that is, the extent to which this public institution, which is funded substantially by public tax dollars, must make the final part of that process accessible to the public.

 The Regents argue that, to the contrary, the impact of the Data Practices Act and Open Meeting Law on its search process was a significant intrusion on their powers, as stated in the November 4, 2002 resolution. The resolution stated, *inter alia*, that "candidates whom the Board seriously wishes to consider have indicated that they will not participate in public interviews until they have had an opportunity to meet with the Board of Regents privately"; that "the Board of Regents has determined that the Search Process in its current form has obstructed the purpose of the search, which is to enable the Board of Regents to recruit and hire the best possible President for the University"; that "the Board finds that in the absence of confidential interviews with candidates recommended by the PSAC and without confidential deliberations about those candidates, the Board cannot make an informed decision to hire a new President"; and that "the Board of Regents has determined that in order to retain the most qualified person to serve as University President, the Board must have an opportunity to confidentially interview leading presidential candidates and confidentially deliberate about the qualifications of those candidates."

The difficulty posed by the resolution language is that the only factual statement is that an unspecified number of the candidates recommended by the search committee would not participate in public interviews without first meeting with the Regents privately. The remainder of the excerpts are conclusions—not facts—drawn by the Regents.

In the absence of more factual foundation, the resolution on its face is inadequate to support a conclusion that the application of these statutes is a sufficient intrusion which violates the University's autonomy. That some candidates for a high profile public post may choose not to make themselves available publicly is not enough. The fact is that presidential searches in a majority of states are subject to public access statutes at least as broad as the Data Practices Act and Open Meeting Law. *See* Nick Estes, *State University Presidential Searches: Law and Practice*, 26 J.C. & U.L. 485, 488 (2000). Because of the variations and differences in the legal status of the affected universities, this provides little legal support for one position or another. But the prevalence of these "open" processes does rebut any generalization that presidential searches cannot effectively be performed under such requirements.[5] We agree with the commentators who have acknowledged that there are pros and cons on both sides of the openness/privacy issue in presidential searches, and concluded that determination of the proper approach is a policy issue that balances the pros and cons and is not an issue of such dimension that opting for openness interferes with the effective management of the university. *See, e.g.,* Michael J. Sherman, *How Free Is Free Enough? Public University Presidential Searches, University Autonomy, and State Open Meeting Acts*, 26 J.C. & U.L. 665, 698–99 (2000); *see also* Harlan Cleveland, *The Costs and Benefits of Openness: Sunshine Laws and Higher Education* 27 (1985) ("Most states with protected search processes * * * find it still in their best interest to release the names of candidates on the final short list and allow the public to participate and interact with candidates as part of the final steps of the search process.").[6]

---

**5.** Significantly, in three states in which an exception to a public access statute was enacted expressly for university presidential searches after a court opinion requiring disclosure, the statutory exceptions created still required disclosure of finalist names for a specified period before the final selection is made. *See* Estes, 26 J.C. & U.L. at 494–95. That is all that is required under our Data Practices Act.

**6.** Justice Hanson, in dissent, would remand to the district court for fact-finding to determine "would this application of the Open Meeting Law/Data Practices Act actually have frustrated the ability of the Regents to carry out its fiduciary duties and, if so, was that frustration so significant that it would have resulted in a material intrusion on the internal control and management of the University." Remand seems neither helpful nor appropriate. It is important to separate truly factual aspects of the Regents' resolution from its conclusions. There does not appear to be any dispute that some of the candidates recommended by the committee and whom the Regents were interested in considering expressed a desire not to participate in public interviews unless they could first meet privately with the Regents. The record does not reflect specifically how many candidates were recommended or how many eschewed public interviews, but beyond possibly fleshing out these numbers, it is difficult to see what true facts would be elicited on remand. The characterizations regarding the impact on the ability of the Regents to carry out their fiduciary duties seem at best mixed questions of fact and law. Most important, the assessment of whether any effect was "so significant that it would have resulted in a material intrusion on the internal control and management of the University" seems to us a legal determination regarding the applicability of one of the *Lord* factors. Even if we were to apply administrative law precedent to the Regents as Justice Hanson suggests, where legal conclusions are at issue "the reviewing court is not bound by the decision of the agency and need not defer to agency expertise." *No Power Line, Inc. v. Minn. Envtl. Quality Council*, 262 N.W.2d 312, 320 (Minn. 1977). Because the critical issue in this case is whether any frustration of the presidential selection process was sufficiently serious to be constitutionally significant, that is a legal, not a factual issue, that does not warrant remand.

The Regents urge us to follow the lead of the Michigan Supreme Court in *Federated Publications, Inc. v. Board of Trustees*, in which a majority of that court held that the application of the Michigan Open Meetings Act to the presidential search process of Michigan State University violated the constitutional autonomy of that university's board of regents. 460 Mich. 75, 594 N.W.2d 491 (1999). The Regents assert that the constitutional grant of authority to the governing boards of the Michigan universities is similar to that found in our constitution and therefore the *Federated Publications* opinion provides persuasive authority that our Open Meeting Law cannot constitutionally be applied to the presidential search process. Although in prior cases we have cited with approval Michigan cases interpreting the scope of their universities' autonomy from legislative regulation,[7] we do not find the *Federated Publications* opinion persuasive. First, the rationale used by the Michigan court strikes us as contradictory. On the one hand, the majority explains that the constitutional autonomy of the universities is limited to their proper spheres, stating: "Legislative regulation that clearly infringes on the university's *educational or financial autonomy* must, therefore, yield to the university's constitutional power." *Id.* at 497 (emphasis added). In contrast, the majority then concludes, with little explanation, that the Open Meeting Act "dictates the manner in which the university operates on a day-to-day basis" and its application to the process of selecting a president "infringes on defendant's constitutional power to supervise the institution." *Id.* at 498. We find it difficult to reconcile these concepts and disagree with the conclusion regarding the effect of an open meeting law on the management functions intended to be protected. The dissent's view is more consonant with ours:

> While I agree with the majority that "the Legislature may not interfere with the management and control of" universities, I disagree with its conclusion that the [Open Meetings Act] infringes defendant's constitutional power to supervise the institution. The [Open Meeting Act] is not aimed at any activities peculiar to the university and does not attempt to change or disturb its educational activities. Although it requires that the process of selecting a university president be done in public, it does not tell the board what the criteria should be for selection. It does not dictate the process or the person to be selected.

*Id.* at 504 (Kelly, J., dissenting) (footnote omitted).

In addition, the majority in *Federated Publications* found support for its conclusion in a provision of the Michigan Constitution that requires that "*[f]ormal* sessions of governing boards of the universities shall be open to the public." 594 N.W.2d at 498 (quoting Mich. Const. of 1963, art. VIII, § 4) (emphasis added). In concluding that the search was not a "formal session," the majority reasoned that this provision and the comments of its author at the constitutional convention demonstrate that the issue of open meetings at the universities is the province of the boards, except as limited by article 8, section 4 of the Michigan Constitution. We have no similar constitutional provision or history in Minnesota.

 The Regents also fault the court of appeals for ignoring a 1959 letter opinion of the Minnesota Attorney General in which the Attorney General advised the

---

7. *See, e.g., Lord,* 257 N.W.2d at 801 (citing Michigan authority); *Chase,* 175 Minn. at 268–69, 220 N.W. at 955 (same).

legislature that a statute requiring open meetings for the Regents would violate the constitutional prerogatives of the Regents. *See* Op. Att'y Gen. (March 16, 1959). Opinions of the Attorney General are not binding on the courts, *see, e.g., Governmental Research Bureau, Inc. v. St. Louis County,* 258 Minn. 350, 357, 104 N.W.2d 411, 416 (1960), and, in our view, the conclusory approach of this letter opinion renders it less than persuasive. The Regents argue that it is significant that the opinion has gone unchallenged for many years. We have stated that opinions of the attorney general are entitled to careful consideration when they are of long standing, but have typically coupled this factor with administrative reliance on the opinion. *See id.* (stating that attorney general opinions are "entitled to careful consideration where they are of long standing and accompanied by administrative reliance thereon"); *In re Application of Bartell v. State,* 284 N.W.2d 834, 838 (Minn.1979) ("While we have stated that we will carefully consider such constructions when they are of long standing and accompanied by administrative reliance, in this case we are unable to determine prior agency practice from the record.") Here, there was no administrative reliance on the letter opinion, as the Regents incorporated the policy of the Open Meeting Law into its bylaws. *See supra* footnote 1. Indeed, the absence of a challenge to the letter opinion is as likely the result of the University's voluntary compliance with the Open Meeting Law for those many years as it is the validity of the opinion.

 Finally, we are concerned that if adopted, the Regents' arguments in favor of autonomy may know no discernable bounds. Although the Regents expressly limit their request to a ruling with regard to the presidential search process, the rationale supporting such a holding does not contain a principled end point and could result in exempting the University from many other laws currently applied to it. Our concern flows from the Regents' arguments that their resolution is the equivalent of a statute that creates an exception to the Open Meeting Law; that statutes do not apply to the University unless expressly so stated; that an express definition making a statute applicable to the University does not necessarily include the Regents; that the Regents' resolution declaring that a law interferes with its constitutional autonomy is a legislative fact, rather than a conclusion that is presumed true; and that legislation cannot be made applicable to the University unless it is attached as a condition to an appropriation. These arguments, if given full effect, would essentially elevate the University to the status of a coordinate state entity, not answerable to state government except as it chooses or as limitations are tied to appropriations.[8]

` In summary, while the Regents do not expressly argue that the constitutional preservation of their internal management authority means that the University is to be insulated from any legislation, to which it objects, that might have some impact on the way the University is managed, we are concerned that adoption of their arguments may lead to this result. The framers of our constitution clearly recognized the need for the University to manage

---

8. The University's separation of powers argument raises some of these same concerns and must be rejected for at least two reasons. First, the constitution specifically describes the three branches—legislative, executive and judicial—that are subject to the separation of powers principle. Minn. Const. art. III, § 1. The University is not a separate branch of government. Second, the Data Practices Act and Open Meeting Law apply to the executive branch. If separation of powers does not prevent application of those laws to executive branch agencies, we see no reason why it would prevent application to the Regents.

itself. This constitutional principle has given birth to important litigation, flowing out of the University's and the public's concern as to how this principle is to be given vitality. It is with a sensitive understanding of the tension that exists between the Regents' right to manage the University and the general laws promoting the public's right to information regarding the greatest state educational institution that we adopt the reasoning of an earlier decision of the Michigan Supreme Court:

"Within the confines of the operation and the allocation of funds of the University, [the Board of Regents] is supreme. Without these confines, however, there is no reason to allow the Regents to use their independence to thwart the clearly established public policy of the people of Michigan."

*Regents of Univ. of Mich. v. Mich. Employment Relations Comm'n,* 389 Mich. 96, 204 N.W.2d 218, 224 (1973) (quoting *Branum v. Bd. of Regents of Univ. of Mich.* 5 Mich.App. 134, 145 N.W.2d 860, 862 (1966)).

We·hold, therefore, that application of the Data Practices Act and the Open Meeting Law to the presidential search processes satisfies the standards we articulated in *Lord* and that requiring the release of data on finalists for the position of University President protects the public's right to be informed. As such, release of data on finalists does not violate the underlying constitutional protections insulating the Regents from legislative control, nor does it impede the Regents' ability to "manage" the University. In light of our decision today, we lift the stay of the district court's March 13, 2003 disclosure order upon entry of judgment pursuant to Minn. R. Civ.App. P. 136.02.

Affirmed.

PAGE, J.,·took no part in the consideration or decision of this case.

GILBERT, Justice (dissenting).

I agree with the majority's analysis insofar as it concludes that the Open Meeting Law and the Data Practices Act are generally good policy. I believe, however, that the Minnesota Constitution prohibits the legislature from applying these laws to the Board of Regents' selection of a president for the University of Minnesota. The people of Minnesota have vested the Board of Regents with the authority to manage the University and to select a president. The majority's decision indelibly infringes upon the Board of Regents' constitutional autonomy. For this reason, I respectfully dissent.

The Minnesota Constitution and the University Charter contain significant, special provisions for the University of Minnesota that were established in the territorial laws of 1851. Together, these provisions were designed to ensure that the Board of Regents was granted a unique, independent constitutional status in our state government that reserves in the Board the fundamental power to manage the University. Specifically, the University Charter provides: "The government of this University shall be vested in a Board of twelve Regents, who shall be elected by the Legislature as hereinafter provided." Minn. Laws 1851, ch. 3, § 4. The Charter further states that it "shall be" the "duty" of the Board of Regents "to enact laws for the government of the University" and "to elect a Chancellor," i.e., president of the University. *Id.* § 9. The original Minnesota Constitution, enacted in 1857, provides that "[a]ll the rights, immunities, franchises and endowments heretofore granted or conferred are hereby perpetuated unto the said university." Minn. Const. of 1857, art. VIII, § 3.

In interpreting our constitution, issues "should be resolved, wherever reasonably

possible to do so, in a way to forward the evident purpose with which the provision was adopted." *Diemer v. Carlson,* 550 N.W.2d 875, 882 (Minn.1996) (quoting *Reed v. Bjornson,* 191 Minn. 254, 258–59, 253 N.W. 102, 104 (1934)). We have long recognized that the evident purpose of the Board of Regents' special constitutional status is to have autonomy over the internal management of the University. In *University of Minnesota v. Chase,* 175 Minn. 259, 220 N.W. 951 (1928), our first and most comprehensive analysis of the Board of Regents' autonomy, we held that a state law was unconstitutional insofar as it attempted to subject control of the University's finances. We noted in *Chase* that it had taken 70 years for the first issue of power to be raised between the Board of Regents and the legislature, making safe the assumption that mutual respect makes it unnecessary for the judiciary to mark the precise line dividing their respective jurisdictions. *Id.* at 267, 220 N.W. at 954. We noted that the University's status under our constitution is that of a "constitutional corporation," which is the "highest form of juristic person known to the law." *Id.* at 265, 220 N.W. at 954 (citations omitted). The Board of Regents' power was "put beyond the power of the Legislature by paramount law, the right to amend or repeal which exists only in the people themselves." *Id.* at 265, 220 N.W. at 954. We held that the constitution has vested the Board of Regents with "a power of management of which no Legislature may deprive them," in order to "accomplish its purpose." *Id.* at 266, 220 N.W. at 954.

We did recognize some limitation on the autonomy of the University and the Board of Regents in *Regents of University of Minnesota v. Lord,* 257 N.W.2d 796 (Minn. 1977). In *Lord,* we cautiously permitted the legislature to attach "very minimal conditions on the use of funds appropriated by it to the University which are limited in scope and which are not an intrusion into the internal control and management of the university by its Board of Regents." *Id.* at 802. As part of our reasoning, we recognized that the University had a choice to accept or reject the legislative funding, noting that "[i]f the university were providing all funds for the construction of a building from its own revenues, it would not be subject to the terms of the act." *Id.* at 803. We also recognized in *Lord* that times had changed since we had decided *Chase,* but we emphasized that this change was merely recognition of the increasing amount of appropriations that came from the legislature to help fund the University, not a change in the constitutional autonomy of the University. *Id.* at 802, 220 N.W. 951.

The majority, relying heavily on *Lord,* concludes that the Data Practices Act and the Open Meeting Law "do not tread on" internal University management issues. The majority states: "neither statute is an intrusion into the internal management of the University. They affect the presidential search process only in its interface with the outside world * * *." I disagree. The Open Meeting Law and the Data Practices Act necessarily impede the Board of Regents' internal control over management of the University. The statutes, as applied, mandate procedures by which the Board of Regents selects a president. The application of these statutes to the presidential search process interferes with and obstructs the power given to the Board of Regents to select a president, which may be the most fundamental internal management decision of the Board of Regents. In short, the scope of the intrusion of these statutes unquestionably alters, frustrates and impedes the internal control of the management of the University by the Board of Regents.

Even more fundamentally, unlike the statute we approved in *Lord*, the Open Meeting Law and the Data Practices Act impede the constitutional autonomy granted to the Board of Regents because they are not conditions attached through appropriations. These statutes are generally applicable laws that do not allow the University the choice of whether to accept conditions along with appropriations. In *Lord*, we held that the legislature could place reasonable conditions on the use of funds appropriated to the University that do not impede the internal control and management of the University. 257 N.W.2d at 802. This principle is consistent with the general separation of powers structure of our federal system of government. *See South Dakota v. Dole*, 483 U.S. 203, 207, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (holding that Congress may condition states' receipt of federal funds if it does so unambiguously, enabling states to exercise their choice knowingly). The majority blatantly ignores this fundamental constitutional principle and holds, for the first time in our history, that the legislature may mandate the actions of the Board of Regents in a decision that directly affects the management of the University.

The Michigan Supreme Court has recently decided a nearly identical issue, holding that the application of an open meeting law to a state university's presidential search committee was unconstitutional because it infringed on the university's constitutional power to supervise itself. *Federated Publications, Inc. v. Board of Trustees*, 460 Mich. 75, 594 N.W.2d 491, 499 (1999). In *Chase* and in *Lord*, we cited with approval decisions rendered by the Michigan Supreme Court because of its similar constitutional structure for the autonomous management of a state university. *Chase*, 175 Minn. at 269, 220 N.W. at 955; *Lord*, 257 N.W.2d at 801. In *Federated Publications*, the Michigan Supreme Court held that "[l]egislative regulation that clearly infringes on the university's educational or financial autonomy must * * * yield to the university's constitutional power." 594 N.W.2d at 497. The court held that the open meeting law was a law that "dictates the manner in which the University operates on a day-to-day basis," and was, therefore, unconstitutional. *Id.* at 498.

I would apply similar principles to the case before us and hold that the Open Meeting Law and Data Privacy Act clearly infringe on the Board of Regents' autonomy over internal management of the University of Minnesota. Importantly, the actions taken by the Board of Regents suggest that they carefully considered the policies behind the Open Meeting Law and Data Privacy Act and, in accordance with their power, decided not to follow those policies. Following the passage of the statutes, the Regents looked into adopting a management policy that recognized the goals of the Data Privacy Act.[1] Ultimately, however, the Regents determined that the policy was hindering them from properly managing the University. After an extensive study, the Board of Regents concluded that it was in the interest of the University to carry out a portion of the search for president in confidential manner.[2] According to the resolution, a com-

---

1. Minnesota Statutes § 13.43, subd. 3 (2002), provides that the names of applicants are "private data, except when certified eligible for appointment or when applicants are considered finalists."

2. It is important to note that the Board determined that it would publicize the list of candidates once they became finalists. The only contested period of time in the present matter is the small period where the Board would be initially fielding candidates.

pletely confidential search process had "obstructed the purpose of the search" and "frustrated the ability of the Board of Regents to carry out its fiduciary responsibilities to the people of Minnesota."[3]

Regardless of what the legislature, or we, think of the Board of Regents' conclusion, its decision falls squarely within the realm of its authority to select a president for the University and its autonomy over internal management of the University. That the Board of Regents may reach this conclusion is the "evident purpose" of the constitution and the principles we have recognized since *Chase*. The selection of the president of the University of Minnesota may be the most important management function that the Board of Regents performs. This search is undoubtedly a complex process. The Board determined that it could only "carry out its fiduciary responsibilities to the people of Minnesota" by conducting "confidential interviews" and "confidential deliberations" and concluded that adherence to the Open Meeting Law and Data Practices Act "is seriously detrimental to the University's best interests."

This quasi-legislative action by the Board of Regents is well within the bounds of the constitutional "rights [and] immunities * * * perpetuated unto [the] university" by our constitution. As previously mentioned, constitutional issues should be resolved "to forward the evident purpose with which the provision was adopted." *Diemer*, 550 N.W.2d at 882 (citation omitted). The purpose of Minn. Const. art. XIII, § 3 is to provide the Board of Regents with "a power of management of which no Legislature may deprive them." *Chase*, 175 Minn. at 266, 220 N.W. at 954. The majority ignores the evident purpose for which Minn. Const. art. XIII, § 3 was adopted and instead allows the legislature to directly impede the management process of the University. I would reverse.

HANSON, Justice (dissenting).

I join in the dissent of Justice Gilbert.

HANSON, Justice (dissenting).

I join in the dissent of Justice Gilbert but write separately to state a slightly different and narrower basis for reversal. In my view, the question of whether the

3. The "Resolution Relating to Presidential Search" reads in part as follows:

WHEREAS, candidates whom the Board seriously wishes to consider have indicated that they will not participate in public interviews until they have had an opportunity to meet with the Board of Regents privately;

WHEREAS, the Board of Regents has determined that the Search Process in its current form has obstructed the purpose of the search, which is to enable the Board of Regents to recruit and hire the best possible President for the University;

WHEREAS, the Board of Regents has determined that the Search Process in its current form has frustrated the ability of the Board of Regents to carry out its fiduciary responsibilities to the people of Minnesota. The Board finds that in the absence of confidential interviews with candidates recommended by the PSAC and

without confidential deliberations about those candidates, the Board cannot make an informed decision to hire a new President;

WHEREAS, the Board of Regents has determined that in order to retain the most qualified person to serve as University President, the Board must have an opportunity to confidentially interview leading presidential candidates and confidentially deliberate about the qualifications of those candidates; and

WHEREAS, the Board of Regents has determined that the adherence to the Open Meeting Law and the Minnesota Government Data Practices Act in relation to the University presidential search substantially interferes with the Regents' exclusive constitutional responsibility to govern the University and is seriously detrimental to the University's best interests.

Open Meeting Law and Government Data Practices Act (OML/DPA) impermissibly intrude on the internal control and management of the University by its Board of Regents turns on the legal standing of the Regents' Resolution Relating to Presidential Search of November 4, 2002. I conclude that at a minimum the resolution creates genuine issues of material fact on whether the application of the OML/DPA to this specific presidential search would have impermissibly intruded on the internal control and management of the University. Thus, I would reverse summary judgment and remand for a determination of those fact issues.

The Regents argue that the resolution has a legal status equivalent to a statute, and thus it creates an exception to the OML/DPA. The print media argue that the resolution has no legal importance because, as a matter of law, the application of the OML/DPA would not impermissibly intrude on the Regents' internal control and management because it would not ultimately deprive the Regents of the power to select the president.

Between these two extremes is a third alternative, that the resolution represents an administrative determination that the application of the OML/DPA "has frustrated the ability of the Board of Regents to carry out its fiduciary responsibilities to the people of Minnesota," and that such a determination is entitled to some deference, sufficient to make it presumptively true.[1] I prefer this alternative and, because I would define impermissible intrusion to include material frustration of the Regents' control and management functions, I would conclude that this determi-

nation establishes a prima facie case of material intrusion that would render the OML/DPA unconstitutional as applied to these specific facts. Accordingly, I would reverse the summary judgment and remand the matter to the district court to resolve the fact issues involved in the resolution—that is, would this application of the OML/DPA actually have frustrated the ability of the Regents to carry out its fiduciary duties and, if so, was that frustration so significant that it would have resulted in a material intrusion on the internal control and management of the University.

---

1. *See, e.g., No Power Line, Inc. v. Minn. Envtl. Quality Council,* 262 N.W.2d 312, 325 (Minn. 1977) (reiterating that "a presumption of administrative regularity exists" with respect to administrative determinations); *Reserve Min-ing Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn. 1977) (stating that "decisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by courts to the agencies' expertise.")